Daniel H. **SORDELET**, Appellant–Respondent,

v.

Donna K. (Sordelet) **GOLSTEYN**, Appellee–Petitioner.

No. 02A03–9708–CV–299.

Court of Appeals of Indiana.

May 26, 1998.

Transfer Denied Sept. 4, 1998.

Stephen P. Rothberg, Fort Wayne, for Appellant–Respondent.

Stanley A. Levine, Rothberg & Logan, Fort Wayne, for Appellee–Petitioner.

**OPINION**

FRIEDLANDER, Judge.

Daniel H. Sordelet appeals the denial of his petition to modify a custody order that awarded physical custody of his daughter, Rachel, to Donna K. Sordelet, his ex-wife and Rachel's mother. Daniel presents two issues for review, one of which is dispositive of the appeal. We restate that issue as:

> Were the court's findings of fact supported by the evidence?

We reverse and remand for rehearing.

The facts are that Rachel was born to Donna and Daniel on May 26, 1984 and was the only child of the marriage. On July 28, 1986, the marriage was dissolved by a decree of dissolution entered in the Allen Circuit Court, which granted physical custody of Rachel to Donna and gave liberal visitation rights to Daniel. On December 6, 1996, Don-

na filed a Notice of Intent to Change Residence with the Allen Circuit Court, stating her intention to move to Nashville, Tennessee for career-related reasons and also notifying the court that she intended to move Rachel to Nashville as well. Shortly thereafter, Daniel filed an Objection to Removal and Petition to Modify, requesting that the court change physical custody of Rachel from Donna to Daniel. The matter was set for hearing.

Evidence was presented at the hearing, after which the court issued the following findings of fact:

28. That Rachel is a good student and has been involved in athletics since the fifth grade, namely basketball, volleyball, and now soccer.

29. That Rachel played on a "club volleyball" team for two (2) years and which team did not have any students from either St. Charles School, which school she is currently attending or St. Vincent School where she had gone to school, and Rachel adjusted well and made friends with members of the "club volleyball" team which traveled in organized volleyball competition.

30. That Rachel has made two (2) trips to Nashville, Tennessee and has exhibited an ability to relate to a child close to her age who she met while there on those visits.

31. That Rachel changed schools in the fourth and fifth grades from St. Vincent to St. Charles School and made that adjustment well.

32. That Therese Mihlbauer described Rachel as being in early adolescence.

33. That the report of Dr. Newbauer's psychological testing of Rachel Sordelet was admitted in to [sic] evidence.

34. That Dr. Newbauer's report reveals that "Rachel seems to have adequate skills in adapting to life and that she has a positive relationship with her parents. She has an adequate sense of self-esteem, and seems to have a positive attitude toward school and her teachers."

35. That whereas the focus of Dr. Newbauer's report and psychological testing and interviews were "What will the impact be on Rachel from a move to Nashville, Tennessee and how will this affect her relationship with her father," Dr. Newbauer acknowledged that his report did not focus on what the impact would be on Rachel if her mother moved to Tennessee without her and Rachel was deprived of the stability of her relationship with her mother and with the post-dissolution family unit created by her mother.

36. That Dr. Newbauer acknowledged that part of his inquiry was to determine if there would be any harm to the child in the move or if the child was coping with the move that it would be important for Rachel to be with the parent that she feels most comfortable with.

37. That his report and testimony acknowledged that her peer relationships are "getting more and more complicated with the advent of boy-girl relationships in particular" and "that certainly raises her anxiety level and is probably is [sic] related also to some of her anxiety about the move at this time in her life when she has recently developed a set of peers that she has become friends with and seems to have developed a good sense of trust with."

38. That Dr. Newbauer testified that Rachel is now being challenged and persons can meet challenges if they have a supporting living [sic] family unit.

39. That Dr. Newbauer's testimony was that if Rachel moved she would adjust, and that he did not think that the move would present a challenge that she couldn't cope with.

40. That Dr. Newbauer also testified that Rachel would have anxiety whether she moved with her mother or if she stayed in Fort Wayne by reason of the altered time with either parent.

41. That Dr. Newbauer testified that the move would cause "no harm" to Rachel.

42. That Dr. Newbauer further testified that Rachel's anxiety was situational, i.e. arising out of the move, and that said anxiety was not debilitating, and did not require any kind of psychological treatment or counseling.

43. That Dr. Newbauer testified that Rachel was very self-centered because of her age.

44. That Dr. Newbauer testified that he saw her involved in a network of friends and he saw that as the biggest cost of her move.

45. That Dr. Newbauer testified that he did not see any significant signs of undue parental influence on Rachel.

46. That Dr. Newbauer acknowledged in his testimony that [Donna] has been the primary caregiver of Rachel for the last ten (10) years of her life and that [Donna] further has provided a female role model for Rachel with regard to her education and professional career.

47. That Dr. Newbauer acknowledged that Rachel's family unit with her mother and step-father created after the dissolution was a stable one and had a positive influence on Rachel.

48. That Dr. Newbauer further acknowledged the child's relationship with her primary caregiver as the single most important factor affecting its welfare when the child's parents do not live together.

49. That Dr. Newbauer further acknowledged that the stability within a household may be more important than geographical stability.

50. That Dr. Newbauer further acknowledged that there was no evidence that Rachel wasn't content in her home with her mother and there is evidence[1] that she was anything but developmentally on course and that further her relationship with her mother as primary caregiver was a stable one.

51. That Dr. Newbauer, notwithstanding his concern with the anxiety created in Rachel by potential separation from her peer group and her relationships with them and. [sic] acknowledged that Rachel could cope with the challenge of the move and that said move would not be harmful to her.

52. That the court conducted an interview with Rachel.

53. That it was obvious from the interview that prior to the filing of Petitioner[']s NOTICE OF INTENT TO CHANGE RESIDENCE, Rachel had observed minimal, if any, conflict between the parties.

54. That since the filing of Petitioner[']s NOTICE OF INTENT TO CHANGE RESIDENCE, Rachel has experienced considerable anxiety due to the conflict between the parties.

55. That Rachel experiences a warm and loving relationship with both of her step-parents.

56. That as the primary caregiver, [Donna] provided a detailed description of Rachel and her interests and concerns.

57. That [Donna] testified that her relationship with Rachel was a close one and that Rachel often confided in her and that as an early adolescent she was concerned with Rachel's needs as she entered puberty and she acknowledged coping skills and ability to make friends were good, particularly since she is an athlete.

58. That there was unrebutted testimony that visitation could be exercised by [Daniel] and [Donna] driving to Scottsburg, Indiana, which is approximately three and one-quarter hours from Nashville, Tennessee and Fort Wayne, Indiana.

59. That [Donna] has carefully explored educational potential and schools in Nashville for Rachel and alternative child care arrangements in Nashville.

*Record* at 90–92. The court "approved"[2] Rachel's change of residence from Fort Wayne to Nashville and ordered that Donna retain primary physical custody of Rachel.

### 1.

Prior to the hearing, Daniel requested that the trial court enter findings of fact pursuant to Trial Rule 52 of the Indiana Rules of Trial Procedure. He contends that the findings of

---

**1.** We presume from context that the court omitted a word here and actually intended to state that there was *no* evidence that Rachel was anything but developmentally on course.

**2.** The court correctly noted in its Conclusion of Law that, in the instant case, there was no statutory requirement that the court approve the change of residence, nor did the dissolution decree require such approval.

fact entered pursuant to that request were unsupported by the evidence and thus clearly erroneous.

■ When a party requests specific findings of fact and conclusions of law, the judgment will not be reversed unless it is clearly erroneous. Such a judgment is clearly erroneous only if it is unsupported by findings of fact and the conclusions entered thereon. *Breeden v. Breeden*, 678 N.E.2d 423 (Ind.Ct. App.1997).

> Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. To determine whether the findings of judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility.

*Shafer v. Lambie*, 667 N.E.2d 226, 229 (Ind. Ct.App.1996).

The evidence in question is comprised of the report and testimony of Dr. John Newbauer. The court cited liberally from those sources in its findings of fact. Dr. Newbauer was appointed by the court to evaluate the impact upon Rachel of a move to Nashville. Dr. Newbauer conducted three personal interviews with Rachel, one each with Daniel and Donna, and administered several diagnostic tests and indices to both the parents and Rachel. After completing his evaluation, Dr. Newbauer issued a detailed written report, which was entered into evidence. Dr. Newbauer testified only briefly at the hearing. Most of his testimony centered upon his written report.

Dr. Mihlbauer, the only other expert to testify, was retained by Donna to counsel Rachel. Dr. Mihlbauer did not conduct any tests and saw Rachel for only two sessions. During the first session, Donna was present the entire time. At the second session, Dr. Mihlbauer met with Rachel alone for the initial part of the session, and with Donna and Rachel together at the end of the session. Dr. Mihlbauer spoke with Daniel only one time, by telephone, for three or four minutes. At the hearing, Dr. Mihlbauer's testimony was confined to commenting on what she perceived to be alternative interpretations for Rachel's anxiety. She opined that, in addition to anxiety about leaving Fort Wayne, Rachel may be anxious about other unspecified matters that were unrelated to the pending move to Nashville. When specifically questioned about the matter, Dr. Mihlbauer stated that she neither agreed nor disagreed with the recommendations made in Dr. Newbauer's report and had no opinion as to whether Rachel should move to Nashville with her mother or remain in Fort Wayne with her father.[3]

■ The extent to which the court relied upon Dr. Newbauer's report is made manifest in the court's findings of fact. The findings of fact consisted of sixty numbered

---

3. Interestingly, to the extent that Dr. Mihlbauer's testimony contributed anything new that was relevant to the custody question, it substantially favored Daniel, specifically on the issue of Rachel's preference, if any. The court interviewed Rachel in chambers, although the record does not reflect the substance of the interview. We therefore do not know whether the court asked, or Rachel expressed, a preference in that regard. Dr. Newbauer testified at the hearing that he had asked Rachel whether she wanted to move to Nashville or remain in Fort Wayne. He stated that she responded in the form of ranking the benefits and drawbacks associated with each alternative. Dr. Newbauer reported that Rachel rated equally the pluses and minuses of staying with and being separated from each parent, respectively. However, he testified that Rachel's ranking "of the other items [was] much more in favor of staying [in Fort Wayne]." *Record* at 277. Dr. Mihlbauer's testimony was clearer on the issue:

Q And the child consistently expressed to you a desire to stay in Fort Wayne, correct?
A She did.
Q Did, in fact, the child express to you anxiety or fearfulness in telling her mother this?
A That was presented in the first appointment by both mother and daughter.
Q May I [accept] you [sic] answer as in the affirmative?
A Yes.
Q And did you consider the—consider that expression by the child to be a true statement of the child['s] perception. That she was rather anxious or did have a degree of anxiety over these issues?
A Yes.

*Record* at 347. Dr. Mihlbauer's testimony constituted the only clear evidence of record pertaining to Rachel's preference in this matter.

paragraphs. Findings 1 through 31 set forth biographical data concerning the parties, the marriage, and the procedural history of the custody proceeding. Finding 32 stated that Dr. Mihlbauer "described Rachel as being in early adolescence." *Record* at 90. Findings 33 through 51 addressed the psychological evaluation of Rachel and of the effect upon Rachel of a move to Nashville. The court attributed the findings contained in those paragraphs to Dr. Newbauer and they are presented such that the findings appear to support the court's judgment. In fact, if one were to read the court's findings in isolation from Dr. Newbauer's report and testimony, one would conclude that the court's judgment reflected Dr. Newbauer's recommendation. Such, however, was not the case.

As stated previously, Findings 33 through 52, which were critical to the court's judgment, were explicitly based upon Dr. Newbauer's report and testimony. However, the doctor's report and testimony, read in context, do not support the court's conclusion. For example, the court noted in Findings 39 and 41 that it was Dr. Newbauer's opinion that, if forced to move to Nashville, Rachel would adjust and the move would cause her "no harm". *Record* at 91. The court failed to note, however, that Dr. Newbauer also concluded that the move would not be "a positive step." *Record* at 265, Respondent's Exhibit A at page 6. Thus, there is validity to Daniel's claim upon appeal that the statements and opinions attributed to Dr. Newbauer in the court's findings of fact were lifted out of context. In fact, this occurred to such an extent that the findings might be said to mischaracterize the tenor of Dr. Newbauer's report. We therefore conclude that the evidence upon which the court based the critical findings in question does not support the findings.

In support of our conclusion that the evidence does not support the findings, we need only consider the views attributed to Dr. Newbauer in the court's findings of fact in juxtaposition to the summary section of Dr. Newbauer's written report, which we reproduce below. When such is done, it is obvious that the doctor's conclusions and recommendations are inconsistent with the statements that the court culled from his testimony and written report. The Summary and Recommendation section of the report states:

> This move presents a challenge to Rachel. She has a perception of herself as having a number of friends in her present school and in her present neighborhood. She has two parents who love her and is faced with being separated from one of them, no matter what the outcome happens to be. She is a person who seems to take things rather seriously and although she remains rather calm on the surface, she seems to have a good deal of anxiety about the outcome of events under her facade of calmness and everything's okay. *It is this examiner's opinion, after talking with Rachel for approximately three hours and reviewing the tests that were administered during part of that time, that this move is not a positive step for her. It is my recommendation that she not move if this [is] at all possible. She is showing signs of a great deal of anxiety. I believe with the move this will increase considerably and as a result she is likely to have a great deal of difficulty in making a positive adjustment.* Rachel has made one move in the past, from one school to another, and it was for her apparently a big challenge and an anxiety-producing situation. While there is a tendency to think that if you face one challenge and then face another challenge you can eventually learn to face all of life's challenge's a little more bravely, there is also the issue, which is very important in her development, the issue of peer socialization and friendship development. She sees herself as rooted firmly in her present school and community and *to dislodge her in a sense from [the Fort Wayne] community of cousins, aunts and uncles, friends and teachers who have taken on a supportive role would, I think, have negative consequences for her in the long run.*

*Record* at 26, Report of Psychologist Testing at page 6 (emphasis supplied). We conclude that the findings are not supported by the evidence and therefore reverse and instruct the trial court to vacate its order and conduct a new hearing on Daniel's modification petition.

We wish to make it clear that our decision should not be interpreted as expressing an opinion concerning the difficult question of which parent should receive primary physical custody of the child. We merely hold that the trial court's findings were not supported by the evidence upon which they were ostensibly based, *i.e.*, the report and testimony of Dr. Newbauer. Mindful of the rapidly approaching date of the start of the 1998–99 school year, we further direct the trial court to expedite the hearing in this matter so that a decision may be rendered within forty-five days of the receipt of this opinion.

Judgment reversed and remanded with instructions.

KIRSCH, J., concurs.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Judge, concurring.

The majority construes the trial court's "Findings" to imply that an independent determination of facts was made based upon the testimony of Dr. Newbauer. I do not dispute that such implication may be drawn. However, in actuality, the trial court's enumerated "Findings" are not the court's findings of fact. They merely state what the "testimony" of Dr. Newbauer was. The court did not adopt Dr. Newbauer's testimony or "acknowledgments" as fact; nor did the court make an independent determination of fact in reliance upon the testimony.

In my view, the "Findings" are inadequate without regard to what the evidence may have disclosed in terms of expert opinions. A summary of testimony or a "finding" that a particular witness testified to thus and so is not a finding that the content of the testimony is a fact. *Perez v. United States Steel Corp.* (1981) Ind., 426 N.E.2d 29; *Hehr v. Review Board* (1989) Ind.App., 534 N.E.2d 1122. This deficiency, in itself, would support a remand for findings of fact.

In all other respects, I fully concur.