In re the Marriage of Cathy S.
ALBRIGHT, Appellant–
Petitioner,

v.

Jeffrey BOGUE, Appellee–Respondent.

No. 33A01–0003–CV–82.

Court of Appeals of Indiana.

Oct. 19, 2000.

Rebecca S. Bruce, Muncie, Indiana, Attorney for Appellant.

Dawn E. Wellman, Allen Wellman McNew, Greenfield, Indiana, Attorney for Appellee.

## OPINION

BARNES, Judge

### Case Summary

Cathy Albright (f/k/a Bogue) appeals an order changing custody of their child from Cathy to her ex-husband, Jeff Bogue. We affirm.

### Issues

Cathy presents two issues for our review, which we restate as:

I. whether several of the trial court's findings of fact underlying its modification of custody order are supported by the evidence; and

II. whether the modification of custody order is contrary to public policy because it is based, in part, on Cathy's allegations that Jeff's mother sexually molested the child.

### Facts

The basic facts most favorable to the judgment follow; additional facts will be recited later as needed. On April 17, 1998, Cathy's and Jeff's marriage was dissolved, and Cathy was awarded custody of their sole child, T.B., who was born in 1995. Beginning in May 1998, Cathy began telling Dr. Kent Bullis, a family physician, that she was noticing blood in T.B.'s stools following weekend visitations with Jeff. When Dr. Bullis failed to find any evidence of rectal bleeding, he referred T.B. to Dr. Sandeep Gupta, a gastrointerologist, who performed an upper gastrointestinal endoscopy and a colonoscopy on T.B. after placing him under general anesthesia. These procedures revealed no abnormalities. During the course of 1998 and 1999, Cathy reported a number of health concerns regarding T.B. to Dr. Bullis, including diarrhea, other gastrointestinal complaints, coughing, and nasal congestion; Cathy suggested that these ailments occurred only after Jeff's scheduled visitations with T.B. In June of 1998, around the time Dr. Gupta was seeing T.B., Cathy made her first allegation that T.B. had told her that Grandma Bogue, T.B.'s paternal grandmother, had touched his genitals during visitation with Jeff. This information was given to Dr. Bullis, who questioned T.B. outside of Cathy's presence. T.B. made no statements that Jeff or Grandma Bogue had abused him, but Dr. Bullis decided to refer the child abuse allegation to the Delaware County Office of Family and Children (DCOFC). T.B. did not say anything about the alleged abuse to Carson Redwine, a DCOFC investigator, and he found the abuse allegation to be unsubstantiated. Nevertheless, because it became apparent to Redwine that the alleged abuse would have occurred in Henry County, Cathy requested that the Henry County Office of Family and Children (HCOFC) conduct further investigation into the molestation allegation. HCOFC caseworker Sheila Wooten was assigned to the case, but she was unable to elicit any information from T.B. regarding the alleged molestation. She recommended that Detective Jim Seabolt of the New Castle Police Department interview T.B. because of her belief that he was an excellent juvenile officer and if there is ... some information to be glean-

ed from a child, Jim is usually able to do that. Record p. 409.

However, like Redwine and Wooten, Seabolt was unable to gather any indication that Grandma Bogue had ever molested T.B. Rather, after preliminary questioning regarding good and bad touches, T.B. repeatedly denied that Grandma Bogue had ever touched him inappropriately. After observing T.B.'s demeanor while making those denials, Seabolt informed Cathy that there were no grounds whatsoever for further investigation into the matter. Cathy became upset and asked to speak with T.B. alone, which she did while Seabolt observed from another room. In response to Cathy's questioning, T.B. again denied that Grandma Bogue had ever touched him inappropriately; additionally, he told Cathy that he had never told her that Grandma Bogue had done so. Wooten subsequently filed an official report concluding that the abuse allegation was unsubstantiated.

In October 1998, Cathy filed a pro-se petition for a protective order to prohibit contact between Grandma Bogue and T.B., alleging an instance of abuse that occurred in June 1998, which is apparently the same alleged abuse incident investigated by Redwine, Wooten, and Seabolt. The record does not reflect the precise resolution of this petition or whether a hearing was ever held on it. It was apparently dismissed at some point, though not until Grandma Bogue had been restrained from contacting T.B. for several weeks. The filing of this protective order petition prompted Jeff to file his petition for modification of custody on November 6, 1998, alleging that Cathy was attempting to alienate the affection of T.B. for both Jeff and Grandma Bogue and that Cathy was trying to convince T.B. to lie about the molestation allegations. The trial court did not begin hearing evidence on the modification of custody petition until October 1999. In the meantime, in March 1999, Cathy videotaped herself questioning T.B. about alleged sexual abuse by Grand-

ma Bogue. In the video, T.B. appears to state that Grandma Bogue had placed his cousin's butt in her mouth and that she had done the same to him. However, none of the HCOFC caseworkers, law enforcement officers, or psychologists involved with T.B. believed that the videotape presented any indication that T.B. had been molested, due in part to the manner in which Cathy questioned T.B.

The creation of the videotape prompted another round of investigation by the HCOFC and the New Castle Police Department, this time by caseworker Lisa Row and Detective Andy Hood. T.B. was again interviewed, and again he did not give any indication that Grandma Bogue or anyone else had molested him. During this investigation, T.B. also told Row and Hood, without prompting, that we hated Grandma Bogue and Cathy's current husband's ex-wife, and that if we see Grandma Bogue ..., we're going to kill [her]. Record p. 802. T.B. said that we meant him and his mother. However, during the same interview he told Hood that he enjoyed going to Grandma Bogue's house and that nothing had ever happened to him there. The end result of the investigation was that the abuse allegation was unsubstantiated. Hood considered filing charges against Cathy for filing a false police report, but was dissuaded by his superior from doing so. The trial court conducted hearings on the modification petition on October 4, December 15, and December 21, 1999. In addition to testimony from Cathy, Jeff, Dr. Bullis, Wooten, Seabolt, Row, and Hood, the court heard from the following individuals: Glenn Davidson, a clinical psychologist who treated T.B. regularly for several months in 1998 following the divorce; Mark Herbkersman, a court-appointed visitation counselor for Cathy and Jeff; Margaret Purvis, a professional court-appointed custody evaluator; and Stephen Marsh, a psychologist who evaluated T.B. at the end of November 1999. Among other things, Davidson testified that he was never given

any indication that T.B. had ever been molested. Herbkersman testified that, during the course of trying to arrange an agreed-upon visitation schedule, Cathy was attempting to put up various barriers to visitation and that she didn't want [Jeff] to have [T.B.] for any reason. Record pp. 509–10. Purvis recommended changing custody from Cathy to Jeff based in part upon her conclusion that Cathy's behavior is not always well intended and that she seems obsessed to the point of being ·hysterical in believing that the paternal grandmother has abused this child. Record p. 658. Finally, and most disturbingly, Marsh related that T.B. was exhibiting anxiety, depression, and aggressive behavior, and that he had verbalized a wish to be dead. Marsh could not state what precisely had caused T.B.'s emotional problems, but postulated that it may have resulted from his exposure to conflict, family discord, and aggressive behavior. On January 24, 2000, the trial court entered its order on the petition to modify custody. It determined that there had been a substantial change of circumstances since the date of the original custody decree and that modification of custody from Cathy to Jeff was in T.B.'s best interests. Concluding that Cathy had significantly impaired T.B.'s emotional development, it further ordered that any visitation between Cathy and T.B. be supervised until further notice. Pursuant to Jeff's request under Indiana Trial Rule 52, the trial court entered fifty-four findings of fact and six conclusions of law in support of its order. Cathy has appealed.

### Analysis

### I. *Sufficiency of the Evidence*

Cathy contends that ten of the trial court's findings were either not supported by the evidence or were based upon mischaracterization of evidence. Appellant's Brief p. 22. Those findings follow:

19. Although Dr. Bullis· did not see blood in the child's stool, he recommended, because the Mother insisted she saw it, that the child be seen by Dr. Sandeep Gupta, a pediatric gastrointerologist.

21. Dr. Bullis observed a pattern in the complaints made by Cathy Albright about [T.B.] in that all of the symptoms were somehow related to visits with Father. Cathy attempted to enlist him in her attempt to stop or restrict visitation between Father and son, but he was unwilling to do so.

22. Both Doctors Kent Bullis' and Sandeep Gupta's physical examinations of the minor child were normal. Neither found blood in the stool. Stool studies were performed at Indiana University, James Whitcomb Riley Hospital for Children, all of which were negative.

24. Both parties testified that the Mother attempted to get Dr. Gupta to restrict the visitation between Father and son and Dr. Gupta refused to do so.

27. On June 11, 1998, [T.B.] was in Dr. Bullis' office and was interviewed by Dr. Bullis. Dr. Bullis' records indicate that the minor child told him that he missed his dad, enjoyed seeing his dad, ... and that he likes to play with his dad. He further stated, when asked about Grandmother Bogue, indicated that she did not sexually abuse him.

29. At a follow up visit at Dr. Gupta's office on July 31, 1998, Cathy Albright, when offered additional tests, indicated that she thought the problem was a visitation problem and that she would take care of it herself.

34. In March, 1999, Cathy Bogue purportedly received information from [T.B.] which led her to believe that [T.B.] had again been sexually abused by his paternal grandmother during a visit at Father's home which prompted Cathy and her present husband to make a video tape of the minor child where he purportedly admitted to the sexual abuse. The Court finds no credible evidence of sexual abuse from the tape or any other · evidence submitted to the Court.

39. Cathy did not contact the Father to indicate that she felt the paternal grandmother was attempting to sexually abuse their child.

40. In September, 1998, Cathy Bogue contacted Dr. Bullis and attempted to persuade him that [T.B.] had been physically abused by Jeff at a visit. Dr. Bullis did not report it to the Division of Family and Children and found the abuse to be unsubstantiated.

42. Margaret Purvis stated in her report that [Cathy] was obviously in need . . . of individual psychotherapy and that the child should also be in regular therapy. That has not occurred while in Cathy's custody.

In reviewing a judgment where findings and conclusions have been entered, we first must determine whether the evidence supports the findings and second, whether the findings support the judgment. *In Re Paternity of Winkler,* 725 N.E.2d 124, 126 (Ind.Ct.App.2000). Findings of fact are clearly erroneous only when the record lacks any evidence to support them. *National Oil & Gas, Inc. v. Gingrich,* 716 N.E.2d 491, 495 (Ind.Ct. App.1999). In reviewing the findings and judgment entered by the trial court, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* Modification of custody is an area committed to the sound discretion of the trial court, and we are constrained to neither reweigh evidence nor judge the credibility of witnesses. *Joe v. Lebow,* 670 N.E.2d 9, 23 (Ind.Ct.App. 1996). Reversal is warranted only upon a showing of abuse of discretion, or where the decision is clearly against the logic and effect of the circumstances before the court. *Id.*

Perhaps the most critical of the ten challenged findings is number thirty-four, because the videotape of T.B. that Cathy prepared contains the only evidence, aside from Cathy's testimony, that could conceivably be construed as an indication that Grandma Bogue had molested the child.

However, as Jeff correctly points out, the key to this finding is that the trial court found this evidence not to be credible. In light of the testimony regarding the videotape that the trial court received from psychologists, counselors, and trained investigators of child abuse and molestation, it acted entirely within its purview in making that determination. Psychologist Davidson testified that the videotape indicated that Cathy was intent on getting T.B. to state that he had been sexually molested even at the expense of the child's health and mental health. Record p. 265. HCOFC caseworker Row testified that the videotape did not demonstrate anything of significance to me . . . as it relates to the molest because Cathy asked many leading questions after T.B. repeatedly denied having been molested, and because it was impossible to tell how long the child had been questioned due to the lack of a time stamp on the tape and the fact that the tape was stopped at one point. Record p. 464. Detective Seabolt testified that there were many, many things wrong with the manner in which Cathy attempted to interview T.B., and that the content of the tape was almost appalling. Record pp. 749–50. Several other individuals testified in a similar fashion. Thus, it is clear that the record amply supports finding number thirty-four.

Finding twenty-one is important because it supports a conclusion that Cathy was attempting to interfere in Jeff's visitation with T.B. She contends that this finding mischaracterized the evidence because the record only indicated that Cathy was attempting to link T.B.'s bowel-related problems treated by Dr. Gupta with Jeff's visitation, not that she was attempting to link all of T.B.'s health difficulties with visitation. We believe the trial court correctly analyzed the evidence. Dr. Bullis testified, with respect to Cathy's reporting of T.B.'s physical ailments, that while he initially did not draw any conclusion as to any pattern between visitation with Jeff and Cathy's complaints, upon reviewing his

records he agreed that there was a pattern of complaints after visitation with Jeff, while there were no complaints about Jeff's effect on T.B.'s health before the parties' separation. This observation was not limited to T.B.'s gastrointestinal ailments.[1]

Cathy challenges the last sentence of finding twenty-seven on the ground that Dr. Bullis did not testify, nor do his notes suggest, that [T.B.] either stated or indicated that he had not been sexually abused. Appellant's Brief p. 26. Dr. Bullis' records indicate that he talked to T.B. on June 11, 1998, after Cathy's first molestation allegation: I asked him if grandma ever treated him mean, he did not reply. I asked him how grandma treats him, he said she gets mad at me when I watch TV. Record p. 325. At the hearing, Dr. Bullis agreed with Jeff's counsel that certainly the child that presented himself on June 11th didn't appear to have been abused. Record p. 983. Although it may be true that the trial court repeated neither Dr. Bullis' records nor his live testimony verbatim, findings of fact may contain reasonable inferences flowing from the evidence; findings need not be mere recitations of the evidence.[2] There is nothing to suggest that finding twenty-seven is clearly erroneous.

Cathy's challenge to finding forty again reflects her insistence that findings must precisely recite testimony or other evidence. In support of the trial court's finding that Cathy had attempted to persuade Dr. Bullis that Jeff had physically abused T.B., we note the following testimony:

Q: Returning to page 27, October 13, 1998. [Cathy] tries to make an argument that or she's concerned about Jeff possibly physically abusing the child. Correct?

A: Correct.

\* \* \* \* \*

Q: You indicate in your records [the bruise] does not appear related to abuse. Correct?

A: Correct.

Record p. 990. It is clear that this testimony supports finding number forty.

Generally, it suffices to say that Cathy's challenges to the rest of the findings are similar invitations to reweigh the evidence, make credibility determinations, or insist that findings can only recite the evidence verbatim and cannot contain reasonable inferences. We decline those invitations. Cathy cites *Sordelet v. Golsteyn*, 697 N.E.2d 943 (Ind.Ct.App.1998), *trans. denied*, in support of her contention that the trial court mischaracterized evidence in making many of its findings. In *Sordelet*, we reversed a modification of custody order where it was evident that the trial court in its findings of fact had lifted statements from a custody evaluator's report out of context, with the result that it appeared that the evaluator had recommended modifying custody when in fact he had not. *Id.* at 947. Here, there is no indication that the trial court lifted statements or testimony out of context in such a fashion that any finding of fact conflicted with what the evidence actually reflected or with a witness's actual testimony. We conclude that the evidence supports the trial court findings challenged by Cathy.

## II. Public Policy

Next, Cathy claims that the trial court's custody modification order is contrary to public policy embodied in Indiana Code Section 31-33-5-1, which provides that an individual who has reason to believe that a child is a victim of child abuse or neglect

1. Cathy does not challenge the second sentence of finding twenty-one that Dr. Bullis refused Cathy's request for his help in stopping or restricting Jeff's visitation with T.B.

2. In fact, it may be that a mere recitation of evidence or testimony is not a sufficient finding of fact at all. *See Sordelet v. Golsteyn*, 697 N.E.2d 943, 948 (Ind.Ct.App.1998) (Sullivan, J., concurring).

shall make a report as required by this article, and Indiana Code Section 31–33–6–1, which provides immunity from civil or criminal liability for persons who make such reports. Jeff counters that Cathy was likely acting maliciously or in bad faith in making those reports, and thus she would not be entitled to such immunity pursuant to Indiana Code Section 31–33–6–2.

However, the real issue present in this case is not whether Cathy is being penalized in some fashion for her reporting of alleged child molestation to the authorities. Rather, it is clear that the trial court's decision to modify custody was based upon ample evidence to support the conclusion that Cathy was causing harm to T.B. by placing pressure on him to say that he was being molested and by attempting to interfere with Jeff's visitation. We will not speculate as to matters of psychology and whether Cathy's conduct was intentional or unintentional, but the end result is the same: severe emotional damage to T.B. We are not concerned here with potential harm to Grandma Bogue or Jeff that might have resulted from Cathy's accusations; whether Cathy could face civil or criminal liability based on such harm is not before us. We are concerned solely with the welfare and best interests of T.B. and whether there was a substantial change in circumstances that justified modification of the original custody order.

Indiana Code Section 31–17–2–21 governs child custody modifications and it provides in pertinent part:

(a) The court may not modify a child custody order unless:

(1) the modification is in the best interests of the child; and

(2) there is a substantial change in one (1) or more of the factors that the court may consider under section 8 of this chapter.

(b) In making its determination, the court shall consider the factors listed under section 8 of this chapter.

The factors listed in Indiana Code Section 31–17–2–8 include:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic violence by either parent.

In considering these factors, the trial court's inquiry is strictly limited to consideration of changes in circumstances that have occurred since the last custody decree. *Hanson v. Spolnik*, 685 N.E.2d 71, 77 (Ind.Ct.App.1997), *trans. denied.*

We note that the trial court did not explicitly state which of the statutory factors it believed had created a substantial change in circumstances. However, when, as here, a party has requested specific findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind.1998). Before affirming on a legal theory supported by the findings but not espoused by the trial court, the reviewing court should be confident that its affirmance is consistent with all of the trial court's findings of fact and inferences drawn from the findings. *Id.*

■ The trial court's findings support a conclusion that modification of T.B.'s custody was required by a substantial change of circumstances regarding T.B.'s mental and physical health. We have previously held that if one parent can demonstrate that the other has committed misconduct so egregious that it places a child's mental and physical welfare at stake, a custody order may be modified. *Hanson,* 685 N.E.2d at 78. There is ample evidence of such misconduct on Cathy's part, and of the effect of that misconduct on T.B.'s health. In addition to the findings challenged by Cathy that we have already recited and discussed, numerous other findings not challenged by Cathy, and which are clearly supported by the record, substantiate this conclusion.

For example, finding twelve states:

Mr. Herbkersman [the court-appointed visitation counselor] perceived that Cathy was less than cooperative in the process, was not straight forward, and seemed to be lying about events during the counseling sessions with her. In Mr. Herbkersman's opinion, Cathy was regularly coming up with road blocks to prevent substantive and overnight visitation with the Father.

Record p. 129.

Finding thirty, which is critical with regard to Cathy's effect on T.B.'s mental health, states in part:

Dr. Davidson believed that the Mother was coaching the child and attempting to get the child to suggest that a molestation occurred when in fact it had not. . . . In Dr. Davidson's opinion, if the child were left in the Mother's care, he would have severe psychological problems as a

result of Mother's inappropriate suggestions.

Record p. 132.

Finally, finding forty-one states:

Through Margaret Purvis, the custody evaluator, the Court finds that [T.B.] is at risk if he continues to reside with the Mother because of her near hysterical response to the purported allegations; that Mother maintains a bias against the Father; . . . that under all the circumstances to be considered, Jeffrey Bogue should have custody of the minor child, [T.B.].

Record p. 134. The record reflects that had it chosen to do so, the trial court could have made a number of additional findings with respect to Cathy's misconduct and its effect on T.B. Nevertheless, the fifty-four findings it did make support the modification order.

In addition to the fact that Cathy made unsubstantiated child molestation accusations to the authorities, it is evident that there was a substantial change in circumstances justifying the modification of T.B.'s custody.[3] None of the misconduct in this case occurred prior to the original custody decree, and at the time of the hearing on this matter, there were indications that T.B. was suicidal, whereas there was no evidence of such a severe level of emotional distress at the time of dissolution. The evidence indicates that Cathy has caused emotional damage to T.B. and that such damage would only continue to increase if he were left in her care. To not change custody of T.B. in the face of evidence that Cathy was damaging T.B.'s mental health could have placed him in serious jeopardy. There is indeed a strong public policy in favor of good-faith reporting of suspected child molestation; that public policy has not been damaged here. We are dealing

---

**3.** In *Hanson,* we noted that one parent had made repeated unsubstantiated sexual abuse allegations against the other parent in support of affirming the trial court's modification of custody to the other parent. In doing so, we said we do not intend to suggest that a parent's allegations of sexual abuse will support

a change of custody. 685 N.E.2d at 78, n. 6. However, in that case, unlike the present case, we were not faced with expert testimony that the child had likely been coached into making those allegations and evidence of the effect of such coaching on the child's mental health.

in this case with an equally strong public policy: ensuring that custody of the children of divorced couples may be modified when there is a substantial change in circumstances and the welfare of the child demands such a modification. The trial court did not abuse its discretion in concluding that modification of custody was necessary in this case.

## Conclusion

We conclude by emphasizing the importance of that portion of the trial court's order requiring that both parties refrain from making negative comments about the other party or their extended family and that each party use their best efforts to keep members of the respective extended families from doing the same. Record p. 138. This applies to both Cathy and Jeff. T.B. has been the subject of a tug-of-war for well over two years and for his sake this battle must end.

The trial court's findings are supported by the evidence or reasonable inferences flowing therefrom. Furthermore, the findings adequately support the ultimate conclusion that modification of T.B.'s custody from Cathy to Jeff was warranted by a substantial change of circumstances regarding T.B.'s mental health and that a modification of custody was in T.B.'s best interests. Finally, ensuring the mental and emotional health of children is clearly a strong and well-grounded part of public policy, and we believe this modification of custody order furthers that policy without contravening the public policy favoring good-faith reporting of suspected child abuse or molestation.

Affirmed.

BAILEY, J., and RILEY, J., concur.