## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 05 2019, 9:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan D. Harwell
Harwell Legal Counsel LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Amanda R. Blystone
Austin T. Robbins
Broyles Kight & Ricafort, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Shane Adams,

*Appellant-Petitioner,*

v.

Aubree Scaife,

*Appellee-Respondent*

August 5, 2019

Court of Appeals Case No.
19A-JP-194

Appeal from the
Hamilton Circuit Court

The Honorable
Paul Felix, Judge

Trial Court Cause Nos.
29C01-1409-JP-1174
29C01-1409-JP-1175

**Vaidik, Chief Judge.**

# Case Summary

[1] Shane Adams ("Father") appeals the trial court's order granting Aubree Scaife ("Mother") primary physical custody and sole legal custody of their two children and finding Father in contempt for failing to comply with the trial court's prior orders. Finding that the evidence supports the trial court's modification of physical and legal custody and finding of contempt, we affirm.

# Facts and Procedural History[1]

[2] Father and Mother (collectively, "Parents") have two children together, R.A., who was born in 2005, and L.A., who was born in 2009 (collectively, "Children"). Parents were never married, and Father's paternity of Children was established by paternity affidavit at each child's birth. *See* Appellant's App. Vol. II p. 78. L.A. suffers from significant health issues, including autism, chromosomal duplication, developmental delay, impaired speech, and blindness. Because of these disabilities, L.A. receives funds from the Social Security Administration (SSA).

[3] After Parents' relationship ended in 2015, a paternity case was opened, and Parents submitted a mediated agreement to the trial court. In the agreement,

---

[1] The following facts are taken largely from the Guardian ad Litem's (GAL) report. During the modification-of-custody hearing, there was not much evidence presented beyond the GAL's report. *See* Tr. pp. 4-23. The trial court took judicial notice of the GAL's report and accepted it as evidence, and Father did not object to it doing so. *See id.* at 4-5. On appeal, the statements of facts in both parties' briefs rely heavily on the GAL's report.

Parents agreed to share legal custody of Children, Father would have primary physical custody of Children with Mother exercising substantial parenting time, any SSA funds they received on behalf of L.A. would be deposited into a bank account for L.A.'s benefit that Father and Mother would be able to access, neither Father nor Mother would withdraw any SSA funds from L.A.'s bank account without "prior written approval" from the other parent, R.A. would stay in Westfield schools, and L.A. would stay at the Behavior Analysis Center for Autism (BACA). *See id.* at 26-27. Their agreement also stated that if "[Parents] cannot agree regarding the school choice for [Children] [Parents] shall attend mediation to address the impasse." *Id.* In February 2015, the trial court accepted Parents' agreement and entered its terms as an Agreed Entry.

[4] In July 2016, Mother filed a petition to modify custody, parenting time, and child support. Before a hearing on Mother's petition could be held, Parents entered into an agreement, which the trial court accepted. The agreement was that Parents would "equally share physical custody and parenting time of [Children]" and that they would continue to share joint legal custody of Children. *Id.* at 37.

[5] In September 2016, Father unilaterally withdrew L.A. from BACA and placed him in school at ABC Therapy. *See id.* at 86. In April 2017, Mother filed a petition for contempt, alleging that Father had used L.A.'s SSA funds to pay his cable bill and online-gambling fees. *See* Appellee's App. Vol. II p. 3. On June 3, the trial court held a hearing on Mother's contempt petition. After the first day of the hearing, the matter was continued to June 12, but before the hearing

resumed, Father agreed to repay $2,395.35 that he had used from L.A.'s SSA account and to pay Mother's attorney $1,900 within 180 days. *See id.* at 7. On June 12, the trial court accepted Parents' agreement, entered the terms of the agreement as an Agreed Entry, and dismissed the contempt petition.

[6] Two months later, in August 2017, Mother filed a second petition for contempt, alleging that Father had not complied with the trial court's order to repay L.A.'s SSA funds and that he had not paid her attorney $1,900. In September, the trial court held a hearing on Mother's second contempt petition. After the hearing, the trial court ordered Father to deposit $2,395.35 into L.A.'s bank account and to pay Mother's attorney $1,900 by December 12. On December 12, Parents filed an agreement with the trial court that set up a payment plan for Father to repay L.A.'s SSA funds, with the first payment due on April 1, 2018.

[7] In May 2018, Mother filed a third petition for contempt, alleging that Father had not begun repaying L.A.'s SSA funds nor had he paid her attorney $1,900. Mother also requested a modification from joint legal and physical custody to her having sole legal and primary physical custody, and a modification of child support. In support, she alleged that Father was unstable and incapable of caring for Children. *See* Appellant's App. Vol. II p. 47. After Mother filed her third petition for contempt and second request to modify legal and physical custody, the trial court appointed a GAL to investigate. In September 2018, on the day the GAL was scheduled to interview R.A., Mother's attorney informed the GAL that Father had moved without informing Mother, Mother's attorney, or the trial court. The GAL met with R.A. at her school and asked R.A. about

Father's move. R.A. told the GAL that "Father told her not to tell Mother about the move" and that "[Father] won't communicate with [Mother] at all and won't respond to texts[.]" *Id.* at 81. R.A. said that "she wants Father to be more stable and 'get a nicer house and stay someplace'" and that "they have 'moved so much it[']s becoming routine, but annoying.'" *Id.* at 82.

[8] As far as school, R.A. told the GAL that "she really wanted to go to University High School" and that she thought Mother would like her to be able to attend University High School but was uncertain if Father would agree. *Id.* at 83. After the interview, Father told the GAL that Mother had submitted an application for R.A. to attend University High School and that he was upset that Mother submitted an application without telling him. Regarding L.A., the GAL was unable to conduct an interview with him because of his disabilities, so she interviewed his teachers and caretakers. The supervisors and staff at L.A.'s school, ABC Therapy, told the GAL that "it was not uncommon for [L.A.] to have violent tantrums, or have aggressive outbursts." *Id.* at 85. L.A.'s Board-Certified Behavior Analyst, Ambrosia Grady, told the GAL that Mother and Father have differing objectives and goals for L.A. and "that sometimes this creates problems for crafting action items and overall strategies for [L.A.]." *Id.* at 86. Grady also said that Mother and Father have different approaches toward L.A.'s unwanted behaviors. Grady told the GAL, "For example, when [L.A.] becomes agitated, Father will often sing to him to calm [L.A.] down. Mother disagrees with this approach, alleging that [L.A.] enjoys the singing and it actually serves to encourage the behavior, not correct it." *Id.* Grady said that

"it would not be the practice at ABC Therapy to sing, or do something similar, to calm [L.A.] down." *Id.* All of the health, education, and medical professionals that the GAL spoke with regarding L.A. were "very clear that stability and consistency were absolutely paramount to [L.A.]. Changes in his routine cause [L.A.] to, often violently, react with unwanted behavior." *Id.*

[9] The GAL also interviewed Parents. During the GAL's interview with Mother, Mother expressed concern about differences in parenting styles between herself and Father regarding L.A. Mother told the GAL that "Father let[s] [L.A.] do whatever he wants" and "does not use the therapy techniques encouraged by the school, or Ms. Grady." *Id.* at 86. Mother said that "this leads to major outbursts when [L.A.] is with her, because [L.A.] is unaccustomed to not getting his way," and his "condition makes it very, very difficult for him to process and respond to changes in his structure and surroundings." *Id.* For example, Mother told the GAL that Father does not make L.A. wear a seat belt, then "when [L.A.] freaks out with Mother when he is being belted in, Father blames Mother for her inability to control [L.A.]." *Id.* at 91-92. When the GAL asked Father about this, Father confirmed that he does not make L.A. wear a seat belt because L.A. "routinely reacts violently if you make him wear the seat belt. He will bang his head on the window, flail his arms, and hurt himself and those around him." *Id.* at 91. Mother also told the GAL that she was concerned that Father's housing and finances were unstable. Her biggest concern was that Father misappropriated L.A.'s SSA funds and used them for his personal expenses.

[10]     When the GAL arranged to interview Father, Father later called to reschedule and stated that he had been in an accident. He told the GAL "that his car had been totaled and that he needed to work things out with the insurance company." *Id.* at 96. The next week, when the GAL was observing Children at Mother's house, L.A. "kept complaining about his head hurting and the really loud noise." *Id.* When the GAL asked what was wrong, R.A. told the GAL that she and L.A. were in the car accident with Father and that L.A. hit his head on the window and that the really loud sound of the impact bothered him. *Id.* The GAL asked Mother if Father had told her that Children were in the car accident, and Mother said no. When the GAL spoke with Father, he "confirmed that he did not tell Mother about the accident." *Id.* at 97. When the GAL told Father this lack of communication was concerning, Father said, "I have no interest in talking to [Mother]." *Id.* Father told the GAL that "he had not spoken to Mother in 'basically eight months.'" *Id.* When the GAL asked Father about allegations regarding his misappropriation of L.A.'s SSA funds, he said that he had used L.A.'s SSA funds for his own expenses but did not say why he had not repaid L.A.'s SSA funds after being ordered to do so. Finally, the GAL investigated Father's housing and found that Father "has had at least four eviction proceedings filed against him since 2012." *Id.* at 93. In 2018 alone, the GAL discovered that Father had two eviction proceedings filed against him. When asked about his recent eviction, Father "became vague and said technically they had filed an eviction proceeding" and "that he didn't pay the rent on the apartment for several months so that he could use the money as the down payment on the new house[.]" *Id.* The GAL also discovered that

Father had recently filed for bankruptcy in March 2018. When the GAL asked Father if he had filed more than one bankruptcy, Father told her he had filed for bankruptcy twice; however, the GAL was able to confirm that Father had filed for bankruptcy five times. *See id.* at 94.

[11] After the GAL finished her investigation, she submitted a report to the trial court, concluding that a change in custody and parenting time would be in Children's best interests. *See id.* at 105. Specifically, the GAL found that Parents "are incapable of communicating and cooperating in a manner necessary to make joint legal custody practicable"; "given the severity of [L.A.'s] condition, the need for stability and consistency in [Children's] lives and daily routine is paramount"; and "the number and frequency of Father's moves and Father's resistance to communicate with Mother is detrimental to Father's ability to provide the necessary structure and stability for [Children]." *Id.* Ultimately, the GAL recommended that Mother be granted sole legal custody and primary physical custody.

[12] In December 2018, the trial court held a hearing on Mother's third petition for contempt and request for modification of physical and legal custody and child support. Father, appearing without an attorney, declined to present any witnesses, evidence, or testimony, and he did not make any argument regarding Mother's allegation that he was in contempt. Mother, who was represented by counsel, testified that Father had not repaid "a penny" of what he owed for using L.A.'s SSA funds for his personal expenses. Tr. p. 14. After the hearing, the trial court issued an order approving and adopting certain recommendations

of the GAL, including granting Mother primary physical custody and sole legal custody of Children and finding Father in contempt of its prior orders. *See* Appellant's App. Vol. II p. 115-17.

[13] Father now appeals.

# Discussion and Decision

[14] Father raises two arguments on appeal. He contends that the trial court erred by granting Mother primary physical custody and sole legal custody of Children and by finding him in contempt for failing to comply with the trial court's previous orders.

# I. Modification of Custody

[15] Father contends that the trial court erred by granting Mother primary physical custody and sole legal custody of Children. "Modification of custody is an area committed to the sound discretion of the trial court, and we are constrained to neither reweigh evidence nor judge the credibility of witnesses." *Albright v. Bogue*, 736 N.E.2d 782, 787 (Ind. Ct. App. 2000). Custody modifications will be reversed "only upon a showing of abuse of discretion, or where the decision is clearly against the logic and effect of the circumstances before the court." *Id.* (physical custody); *see also Higginbotham v. Higginbotham*, 822 N.E.2d 609, 611 (Ind. Ct. App. 2004) (legal custody).

# A. Physical Custody

[16]     Father first argues that the trial court erred in modifying physical custody of Children.  To modify an existing custody order, the trial court must find that modification is in the best interests of the child and that there is a substantial change in one or more of the factors to be considered by the court.  Ind. Code § 31-14-13-6.[2]  The court is to consider the following factors:

> (1) The age and sex of the child.

> (2) The wishes of the child's parents.

> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

> (4) The interaction and interrelationship of the child with:

> > (A) the child's parents;

> > (B) the child's siblings; and

> > (C) any other person who may significantly affect the child's best interest.

> (5) The child's adjustment to home, school, and community.

---

[2] We note that both parties incorrectly cited to Article 17 of Title 31, which is applicable to custody in dissolution of marriage, legal separation, or child-support actions, *see* Ind. Code § 31-17-2-3, rather than Article 14, which is applicable to paternity actions.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

Ind. Code § 31-14-13-2. We have said that "[c]ontinuity and stability in the life of a child is an important component in determining the proper custodial arrangement for a child." *In re Paternity of M.J.M.*, 766 N.E.2d 1203, 1210 (Ind. Ct. App. 2002).

[17] Father asserts that "there has been no substantial and continuing change of circumstances" to modify physical custody. Appellant's Br. p. 21. He specifically argues that "at most" the evidence shows "prior instability of [Father,] but not current instability." *Id.* at 17. The record reveals that over the years, Father and Children have moved frequently. As Father points out, a "reasonable frequency of changes of residence cannot by itself be regarded as detrimental" to children justifying modification; however, in extreme cases, where the custodial parent and children have no permanent home, "the frequency of changes of residence may rise to the level where detriment to the children is evident." *Winderlich v. Mace*, 616 N.E.2d 1057, 1060 (Ind. Ct. App. 1993), *reh'g denied.* Here, in September 2018, after the GAL had been appointed, Father relocated, unexpectedly, and without telling Mother, Mother's attorney, the trial court, or the GAL. *See* Appellant's App. Vol. II p.

102. Then, during her investigation, the GAL discovered that Father has had "at least four eviction proceedings filed against him since 2012," with two eviction proceedings filed against him in 2018. *Id*. at 93. Father said that "technically" there was an eviction proceeding filed but told the GAL that the reason was because "he didn't pay the rent on the apartment for several months so that he could use the money as the down payment on the new house." *Id*. Furthermore, during her interview with the GAL, R.A. said that they have "moved so much it[']s becoming routine, but annoying." *Id.* at 82. The GAL found that the number and frequency of Father's moves "is detrimental to Father's ability to provide the necessary structure and stability for [Children]," particularly with regard to L.A., for whom "the need for stability and consistency" "is paramount." *Id.* at 105.

[18] The record also shows that Father has had some financial instability. The GAL discovered that Father has filed for bankruptcy five times, as recently as March 2018. *See id.* at 94. Additionally, it is concerning that Father admitted that he used L.A.'s SSA funds for his own expenses, allegedly to pay his cable bill and online-gambling fees. We find that all of this evidence supports the trial court's conclusion that modification of physical custody is in Children's best interests and that there had been a substantial change in one or more of the above factors. That is, Father's continued lack of stable housing and finances caused a substantial change affecting Children's mental and physical health and well-being. *See In re Paternity of J.G.*, 19 N.E.3d 278, 283 (Ind. Ct. App. 2014).

Therefore, we do not find that the trial court erred in granting Mother primary physical custody of Children.

## B. Legal Custody

[19] Father next argues that the trial court abused its discretion when it modified legal custody of Children. Parents who are awarded joint legal custody "will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." Ind. Code § 31-9-2-67. The issue of joint legal custody in paternity proceedings is governed by Indiana Code section 31-14-13-2.3, which states, in subsection (a), that "the court may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interest[s] of the child." To determine what is in the best interests of the child, subsection (c) provides a list of factors for the court to consider:

> (1) the fitness and suitability of each of the persons awarded joint legal custody;
>
> (2) whether the persons awarded joint legal custody are willing and able to communicate and cooperate in advancing the child's welfare;
>
> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;
>
> (4) whether the child has established a close and beneficial relationship with both of the persons awarded joint legal custody;

(5) whether the persons awarded joint legal custody:

     (A) live in close proximity to each other; and

     (B) plan to continue to do so;

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint legal custody; and

(7) whether there is a pattern of domestic or family violence.

Ind. Code § 31-14-13-2.3(c). We have previously held that the second factor—whether the parents are willing and able to cooperate in advancing the child's welfare—is of particular importance in making legal custody determinations. *J.W. v. M.W.*, 77 N.E.3d 1274, 1278 (Ind. Ct. App. 2017); *see also Julie C. v. Andrew C.*, 924 N.E.2d 1249, 1260 (Ind. Ct. App. 2010) (discussing joint legal custody in a dissolution proceeding, under Indiana Code section 31-17-2-15). Where the parties have made child-rearing a battleground, then joint custody is not appropriate. *J.W.*, 77 N.E.3d at 1278.

[20] Father contends that "[t]here was nothing in the record to show that joint [legal] custody should have been terminated based on the communication issues." Appellant's Br. p. 21. We disagree. The record is replete with evidence that Mother and Father do not communicate with one another, even regarding Children being involved in an accident. Father did not tell Mother that Children had been in a car accident where L.A. "hit his head on the window." Appellant's App. Vol. II p. 96. Furthermore, Father told the GAL

that he had "no interest in talking to [Mother]." *Id.* at 97. The gist of Father's numerous complaints about the GAL's report and trial court's findings are essentially requests to reweigh evidence or reassess witness credibility in his favor, which we may not do. We conclude that the trial court did not abuse its discretion when it modified its award of joint legal custody and granted Mother sole legal custody of Children.

## II. Contempt

Father also asserts that he was not afforded due process before he was found in contempt. At the outset, we note that because Father failed to make his due-process claim in the trial court, it is waived. *See Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006) ("It is well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal.").

Waiver notwithstanding, Father has not convinced us that he was deprived of due process. Contempt of court generally involves disobedience of a court or court order that undermines the court's authority, justice, and dignity. *Reynolds v. Reynolds*, 64 N.E.3d 829, 832 (Ind. 2016). There are two kinds of contempt: direct contempt and indirect contempt. *Id.* Indirect contempt, which is at issue in this case, involves those acts "committed outside the presence of the court 'which nevertheless tend to interrupt, obstruct, embarrass or prevent the due administration of justice.'" *Id.* (quoting 6 Ind. Law Encyc. Contempt § 2 (1958)).

[23] Indiana has codified the procedural requirements for finding indirect contempt at Indiana Code section 34-47-3-5, which in relevant part provides:

> (a) In all cases of indirect contempts, the person charged with indirect contempt is entitled:
>
>> (1) before answering the charge; or
>>
>> (2) being punished for the contempt;
>
> to be served with a rule of the court against which the contempt was alleged to have been committed.
>
> (b) The rule to show cause must:
>
>> (1) clearly and distinctly set forth the facts that are alleged to constitute the contempt;
>>
>> (2) specify the time and place of the facts with reasonable certainty, as to inform the defendant of the nature and circumstances of the charge against the defendant; and
>>
>> (3) specify a time and place at which the defendant is required to show cause, in the court, why the defendant should not be attached and punished for such contempt.

This statute essentially fulfills the due-process requirement that a contemnor be provided with adequate notice and an opportunity to be heard. *Reynolds*, 64 N.E.3d at 833.

[24] Generally, a court's authority to find a person in contempt rests on whether a trial court has strictly complied with the statutory requirements set forth in the rule-to-show-cause statute. *Id.* Strict compliance with the statute may be excused if it is clear the alleged contemnor nevertheless had clear notice of the accusations against him or her. *Id.* Examples of this "clear notice" exception include when a contemnor receives a copy of an original contempt information that contains detailed factual allegations of contempt or if the contemnor admits the factual basis for a contempt finding. *Id.*

[25] Father contends that he "was provided no notice of the allegations in the [trial court's] Order [to show cause]." Appellant's Br. p. 12. Although the trial court's order to show cause did not contain detailed factual allegations of contempt, Mother's third contempt petition did contain detailed factual allegations that Father failed to comply with the trial court's order to repay L.A.'s SSA funds and to pay Mother's attorney $1,900. Moreover, we are convinced that Father was aware of the accusations against him. That is, this was Mother's third petition alleging that Father was in contempt for failing to comply with prior court orders to repay L.A.'s SSA funds and to pay her attorney's fees. Accordingly, we find that Mother's petition for contempt provided Father with proper notice.

[26] Affirmed.

Kirsch, J., and Altice, J., concur.