Marianne R. ARMS, Appellant–Respondent,

v.

Larrabee L. ARMS, Appellee–Petitioner.

No. 88A01–0303–CV–95.

Court of Appeals of Indiana.

Feb. 27, 2004.

Matthew Jon McGovern, Louisville, KY, Attorney for Appellant.

Elizabeth W. Swarens, Corydon, IN, Attorney for Appellee.

**OPINION**

FRIEDLANDER, Judge.

In May 1999, Larrabee Arms (Father) filed a petition to dissolve his marriage with Marianne Arms (Mother). The dissolution proceeding culminated in the entry of a dissolution decree in May 2000. The marriage had lasted almost five years. At the time of dissolution, the Armses had one child, four-year-old E.A. Between the filing of the dissolution petition and February 6, 2003, the parties engaged in a bitter custody battle over E.A., which was marked by constant strife. The order appealed from in this action is the latest in a series of custody and visitation determinations issued by the trial court. Specifically, Mother appeals from an order modifying the previous arrangement and granting to Father sole physical custody of E.A., and restricting Mother to every-other-Sunday, non-overnight visitation. Mother challenges both of the aforementioned aspects of the modification order.

We affirm.

Because custody cases are particularly fact-sensitive, we will set forth a detailed description of the facts that are favorable to the trial court's modification order. Before her marriage to Father, Mother had another child, A.B., whose father is Thomas Bass. A.B. is approximately five years older than E.A. During her marriage to Father, Mother had custody of A.B. Mother and Father had separated by April 15, 1999 and Father filed his dissolution petition approximately one month later. Shortly thereafter, the parties entered into an Agreed Provisional Order which provided that they would share joint legal custody of E.A., that Mother would have primary physical custody of E.A., and that Father would have visitation rights with E.A. on Saturday and Sunday. Unfortunately, whatever spirit of cooperation that initially existed between the parties soon disappeared.

On August 20, 1999, Mother filed a complaint with the Washington County Office of Family and Children (WCOFC), alleging that Father and his then-girlfriend, Jobie Dove, had abused E.A. According to Mother's complaint, Father neglected E.A., and Dove hit and burned E.A. Carla Dolan, the WCOFC caseworker investigating the complaint, visited Father's home several times. She observed that E.A. appeared to be "very relaxed and played with both his father and Jobie", *Appellant's Appendix* at 85, he interacted with them on a spontaneous level, and he was openly affectionate with both. Ultimately, Dolan reported that she could not substantiate the allegations of abuse. During her investigation, however, Dolan learned that Mother disliked Dove. E.A. told Dolan that Mother called Dove names. Dolan was

informed by "two collateral contacts" that "Mother [spoke] ill of [Father] and Jobie in E.A.'s presence, referring to Jobie as a 'whore', 'slut' and 'bitch'" and referring to Father as a "pervert". *Id.* In her report, Dolan expressed "concern that [Mother's] obsession with [Father] and Jobie will cause [Mother] to act on impulse which may result in placing [E.A.] in a potentially harmful situation as was the case on 9–9–99."[1] *Id.* at 85–86. Referring to herself as "FCM" in the report, Dolan concluded, "FCM believes that therapeutic intervention is imperative for Marianna Arms so as [sic] Marianne can learn more effective coping methods. FCM has significant concern that Marianne's current coping methods present a risk for potential harm to [E.A.][,] both physically and emotionally." *Id.* at 86.

On November 29, 1999, Father filed a Motion for Contempt and Restraining Order claiming that Mother had failed to comply with the terms of the provisional entry by refusing to take E.A. to Father's for an entire weekend. Mother soon followed by filing a Petition for Contempt Citation of her own. In it, she alleged that Father failed to return E.A. to her for more than a week. In January 2000, Mother filed a Petition for Home Study, citing "serious concerns about the living conditions in [Father]'s home and the environment in which the minor child is residing." *Id.* at 28. The trial court granted that petition and a custody home study of both Father's and Mother's homes was performed by James C. Snook. Snook concluded that Father had a "very good relationship" with E.A., and that "[n]one of the information gathered would indicate that [E.A.] would not be well taken care of, or that he would be in danger if allowed to live with [Father] on a permanent basis."

*Id.* at 53. Snook concluded that Mother loved E.A. "very much" and wanted to "provide a safe and loving home" for him. *Id.* at 73. Snook recommended that a complete psychiatric custody evaluation be conducted on Father, Mother, and E.A.

In October 1999, E.A. began sessions with Dr. Lee Epstein, a psychologist. On November 22, 1999, Dr. Epstein made the following notation in his records: "The childs [sic] awareness of conflict has emerged. At this point in time, the child is being emotionally harmed. The child cannot tolerate anymore [sic] emotional turmoil. [E.A.]'s mother has to refrain from statements concerning his father." *Record* at 83. Periodically thereafter, Dr. Epstein wrote memos regarding E.A.'s progress. A February 2, 2000 report stated:

I have had the opportunity to see [E.A.] (10/18/99; 11/15/99; 11/22/99). A full psychological evaluation was conducted and forwarded to appropriate personnel. There is now concern about [E.A.] being sexually abused. In all the visits I had with this child, there was absolutely no indication of sexual abused [sic] or molestation. The child never brought up any of that information and his temperament did not indicate any trouble related to those issues.

Apparently, this has come up in the past and it has caused rather significant concern to [E.A.]'s biological father. It is in my professional opinion that there was no psychological data to correlate to a sexual abuse issue, and that if this child is being given information leading him to statements [sic] (without support of reality), then he may be significantly harmed. Therefore, it may mean that a change of custody or arrangements for this child would need to be implemented

**1.** Apparently, Mother left E.A. alone in her car on a hot summer day while she walked around the block and initiated a confrontation with Dove at Father's house.

to disengage this very serious series of allegations.

*Id.* at 82. In a March 21, 2000 memo, Dr. Epstein noted that E.A. had "been placed in a jeopardizing circumstance. For the reasons of this child's mental health, it would appear to be in his best interest to be removed to the custody of his biological father so that some sense can be made out of the psychological turbulence of his present life." *Id.* at 81. The foregoing memos predated the home study that was ordered by the court.

On April 26, 2001, Mother's counsel (her second attorney to that point) petitioned for leave to withdraw her appearance on behalf of Mother. The motion was granted. The next day, Father filed his Objection to Motion to Withdraw or, in the Alternative, Motion of Emergency Temporary Custody. In that motion, Father noted that the custody question had been pending for more than one year. He alleged that E.A. was suffering psychological harm as a result of living with Mother, and claimed that additional delay placed E.A. in jeopardy. Father also claimed that E.A. told him that Mother inflicted physical injury on E.A. According to Father, "[M]other inflicts physical injury on the minor child to get him to mind, by scratching and pinching him and the father observes the bruises and scratches on the minor child regularly[.]" *Id.* at 78. In support of his motion opposing Mother's attorney's motion to withdraw, Father submitted a memo from Dr. Epstein. In that April 26, 2001 memo, Dr. Epstein noted that [E.A.] had talked "at great length" about being frightened of Mother. *Id.* at 80. Dr. Epstein also concluded, "E.A. has been psychologically hampered through that situation with his biological mother. The consistency of mannerisms and psychological difficulties indicate that he has sustained psychological impairments which have not improved over time." *Id.*

Following a June 4, 2001 hearing, the trial court modified the custody arrangement implemented in the provisional order. In essence, the trial court reversed the previous arrangement. Father was to have E.A. during the week, and Mother was to have E.A. on weekends. On September 17, 2001, the parties filed an agreement providing for yet another modification of the custody arrangement, pending a September 27 hearing on the matter. That arrangement required that the parties work together in getting E.A. from home to school, school to home, and from one home to the other. It appears that the agreed arrangement did not work well. On January 18, 2002, Father filed a Motion and Affidavit for Emergency Suspension of Overnight Visitation, which included the following allegations:

5. That the mother has been repeatedly tardy getting the minor child to school and repeatedly fails to pick up the child, necessitating that the father either take off work to get the child after school or to have his wife pick up the minor child after school or the father or his wife had to pick the child up from the mother's employment at 6:45 a.m. when she worked at the Green Valley Nursing Home.

6. That when the minor child is taken to school by the mother, the child is frequently physically dirty, in oversized, dirty clothes (9/27/01, 10/1/01, 10/15/01, 11/10/01, 11/19/01, 12/10/01), his underwear have feces in them, he has not been fed properly, smells of dog urine or heavy perfume, his hair is uncombed or badly cut by the mother and he is always very tired....

7. That the mother lost her job at Green Valley Nursing Home in Oc-

tober 2001. She says she quit; Green Valley says she was fired. Now refuses to bring the child back to the father in the mornings as she was supposed to and the child is being taken to school very tired and often neglects to even pick him up at 3:00 p.m. on the says [sic] she is supposed to pick him up....

*Id.* at 132–33. Father also alleged that E.A. was reporting that mother was touching him inappropriately. Accordingly, Father requested that the court suspend overnight contact between Mother and E.A. and restrict her visitation to weekends. In support of his petition, Father attached a report completed by Dr. Epstein in which the latter reported, "[E.A.] told me that his mother had made him make statements regarding seeing sexual activity between his biological father and his wife. I questioned [E.A.] very carefully about this and he continued to tell that same story." *Id.* at 136.

On February 1, 2002, the parties filed another agreement regarding custody and visitation. They agreed to continue joint legal custody. They also agreed that, for a period of two months, Mother would exercise visitation every weekend from Friday at 3:30 p.m. to Sunday at 5:30 p.m. In addition, E.A. would stay overnight at Mother's house every Wednesday. On February 1, 2002, the court appointed Linda Lorch as E.A.'s guardian ad litem.

In January and February 2002, Mother was engaged in a custody battle with A.B.'s father, Bass. On February 17, Bass telephoned Father and told Father he had been awarded primary physical custody of A.B. and was going to drive to Mother's house to pick up the child. Father responded that Mother would not be at home because she was driving to Jeffersonville to meet Father at a McDonald's restaurant to return E.A. to Father's custody. A

short time later, Mother arrived at the McDonald's with both E.A. and A.B. in her car. When Father approached to get E.A., Bass appeared along with another friend, Rick Whittaker, and demanded A.B. Whittaker's, Bass's, and Father's vehicles were parked in such a way that Mother's ability to drive away was limited. E.A. exited Mother's car and went to Father. Mother refused to allow A.B. to go with Bass and a confrontation ensued. As A.B. started to get out of the car, Mother accelerated and struck Bass. Father pulled A.B. clear of Mother's vehicle. Bass ended up on the hood of Mother's car. After he had secured A.B., Father summoned the police.

Believing that Bass and Father had conspired to take A.B. from her, Mother filed a Verified Petition for Contempt Citation and Modification of Custody. Mother alleged that the incident at McDonald's was premeditated and placed E.A. in physical danger. According to the petition, the incident "show[ed] that [Father] has no regard for the safety of his son," and that he was "teaching his son that savage actions against his mother and women are appropriate conduct." *Id.* at 143. On April 22, 2002, Father filed a Verified Petition for Modification of Custody and Establishment of a Child Support Order. In it, Father alleged:

It is in the best interests of the minor child that the father have sole custody of the minor child and that the mother have visitation in accordance with the specific parenting schedule as outlined in the Indiana Parenting Time Guidelines. This request is based on the wishes of the minor child, the wishes of the father, the report of the Guardian Ad Litem, Dr. Lee Epstein's reports, the educational needs of the minor child

and both parties' need for peace and harmony in their homes.

*Id.* at 157.

On June 19, 2002, the trial court entered an order "after conferring extensively with" Lorch. *Id.* at 162. The court's order imposed the following conditions: (1) Mother's midweek visitation was suspended; (2) E.A. was to continue treatment with Dr. Epstein, (3) Mother and Father would exchange E.A. at specified times and locations, and (4) the parties were restrained from talking with E.A. about either the court case or the other party. All other provisions not specifically addressed in the June 19 modification remained in force.

On September 24, 2002, Mother checked E.A. out of school at 2:45 without notifying Father in advance. Two days later, Mother sent E.A.'s juice container to school, and then E.A. took it to Father's home. The container held a note and a raisin. The note referred to Father's wife using a derogatory name, and the raisin was meant to represent a "turd", which is a name that Mother called Father. On September 28, 2002, Mother and Father's wife, Vicki Arms, met at a McDonald's to exchange E.A. After they did so, Mother followed Vicki home and confronted her on her front porch. Vicki told Mother to leave and Mother hit Vicki in the chest and cursed at her. On September 30, E.A. came home to Father's house without his lunchbox. E.A. explained that Mother had come to school at the end of the day to take E.A.'s lunchbox away from him because she had put another note in it. We note also that, around this same time, Mother refused to permit Lorch to enter her home in order to complete an evaluation.

On December 20, 2002, Father filed a Second Verified Petition for Emergency Suspension of Visitation. In support of that petition, Father submitted an affidavit completed by Lorch, which included the following:

3. That at every contact with the child he reports to me that he is concerned that what he says will get back to his mother and he is obviously scared for that to happen.

4. I believe that the child is being truthful with me and that his reports to me and his father and stepmother are true. I am convinced that the mother continues to tell the minor child what to say to professionals and to the Court and is training him to lie. His grasp of reality is being distorted.

5. The last reports, which came to me on December 6 and 15, 2002 contained similar information from [E.A.], that his mom told him to tell some "lady" that his dad and Vicki cuss and say bad words, they pass out from drinking and leave him to fend for himself; that the house was dirty, filled with cockroaches, rats and spider webs, that they would drink and drive, that they do drugs, that he is forced to call his dad a fat pig and Vicki, "Vick it", etc. In the December 15 report, I was told while he was with his mother over the weekend, she got mad at him, yelled at him and slapped him.

6. I am convinced that the mother is playing mind games with the minor child and that she is causing him great confusion and harm.

7. I believe it in the minor child's best interests to suspend all contact with his mother until these allegations have been investigated.

*Id.* at 205–06. Also in support of his petition, Father submitted a letter from Dr. Epstein, which stated, in relevant part, "In

all my years of practice, I have never seen a child who has experienced the conflicts of this young boy. [E.A.] is worried about upsetting his biological mother and is impaired by his troubles with reacting appropriately from that situation." *Id.* at 207.

On February 12 and 13, 2003, the court conducted a hearing on Mother's petition to modify custody and motion for contempt citation, and Father's petition to modify custody. Following the hearing, the court entered extensive findings of fact and conclusions of law. Among other things, the court concluded that Father and Mother were incapable of effectively communicating with each other and therefore unable to effectively make joint decisions concerning E.A. The court concluded that Mother "has an unstable and volatile personality", *id.* at 217, and ordered her to attend anger management classes. The court found that Mother persistently failed to adhere to court-imposed mandates regarding visitation. The court also found that it would be emotionally and psychologically harmful to E.A. to increase contact with his mother and it would be detrimental to remove him from Father's house.

Based upon these and other findings, the court ruled as follows: (1) Father was granted sole legal custody of E.A.; (2) Mother was forbidden to visit E.A. in school; (3) Mother was granted visitation with E.A. on every other Sunday, with no overnight visitation, "because more extensive visitation or parenting time with [E.A.] would be emotionally and psychologically harmful[.]" *Id.* at 222. Mother appeals, challenging two aspects of this order, i.e., (1) granting sole legal custody to Father, and (2) restricting Mother's visitation privileges.

Mother contends that the trial court erred in granting sole legal custody to Father. Ind.Code Ann. § 31–17–2–21 (West, PREMISE through 2003 1st Regu-

lar Sess.) provides that a court may not modify a child custody order unless modification is in the child's best interests and there is a substantial change in at least one of the factors enumerated in I.C. § 31–17–2–8 and, if applicable, § 31–17–2–8.5. Those factors include the following:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

A petitioner seeking modification of an existing custody order bears the burden of demonstrating that the existing custody should be altered. *Kirk v. Kirk,* 770 N.E.2d 304 (Ind.2002). Upon appeal, a trial court's decisions concerning custody modifications are accorded "latitude and deference", *id.* at 307, and will be reviewed only for an abuse of discretion. *Kirk v. Kirk,* 770 N.E.2d 304. We will not substitute our judgment for that of

the trial court if any evidence or legitimate inferences support its judgment. *Id.* That is, we will substitute our judgment for the trial court's only if no evidence or legitimate inferences support its judgment. *Id.* "Therefore, '[o]n appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal.'" *Id.* at 307 (quoting *Brickley v. Brickley,* 247 Ind. 201, 210 N.E.2d 850, 852 (1965) (citations omitted)). Also, I.C. § 31–17–2–21 requires that modifications must be accompanied by a finding that there has been a substantial change in one or more of the statutory factors listed in I.C. § 31–17–2–8. *Nienaber v. Marriage of Nienaber,* 787 N.E.2d 450 (Ind.Ct.App.2003). Finally, when reviewing a judgment where findings and conclusions have been entered, we first determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Albright v. Bogue,* 736 N.E.2d 782 (Ind.Ct.App.2000). "Findings of fact are clearly erroneous only when the record lacks any evidence to support them." *Id.* at 787. Also relevant to this appeal, I.C. § 31–17–4–2 states that when modifying existing visitation rights of a noncustodial parent, a "court shall not restrict a parent's visitation rights unless the court finds that the visitation might endanger the child's physical health or significantly impair the child's emotional development."

■ Mother contends as a preliminary matter that the trial court erred in granting Father's request at the February 2003 hearing to take judicial notice of evidence adduced at hearings held in this matter on October 15, November 14, and December 23, 2002, on the issue of visitation. The essence of Father's request was that, in making the current decision, the court

should consider the evidence adduced at the previous hearings. Father explained that the purpose of his request was judicial economy: "And every bit of [the evidence offered at the previous hearings] is relevant to this hearing today. I just didn't want to go through everything that was done at all those hearings because you've already heard it before and I want it to be shortened." *Appellant's Appendix* at 441. Father's counsel also pointed out that those hearings involved the same matters upon which the trial court would base its decision regarding the competing petitions to modify custody. The parties frame this issue in terms of judicial notice. That is the phrase used by counsel and the trial court when Father's request was made and argued. Our research reveals that courts sometimes refer to what Father's counsel sought here as incorporation by reference. *See Gerrick v. State,* 451 N.E.2d 327 (Ind. 1983). Whatever it is called, the consideration of evidence presented at a previous proceeding in that very same action is sometimes permitted. We conclude that this case is one such instance.

■ A trial court may take judicial notice of law, a fact, or of the contents of the pleadings and filings in the case before it. *Sanders v. State,* 782 N.E.2d 1036 (Ind.Ct.App.2003); *see also* Rule 201 of the Indiana Rules of Evidence. More generally, a trial court may take judicial notice of proceedings that have taken place in that court, and in that cause of action. *Vance v. State,* 640 N.E.2d 51 (Ind.1994); *Gerrick v. State,* 451 N.E.2d 327. The cases cited above—as well as other, similar cases— have permitted incorporating by reference evidence presented in an earlier hearing when doing so would prevent redundancy. That is, courts allow it when it will minimize needless and time-consuming duplication of effort that results in nothing more than the presentation of evidence that is

identical to or cumulative of evidence previously placed before the court in the same case. *See, e.g., Vance v. State,* 640 N.E.2d 51 and *Gerrick v. State,* 451 N.E.2d 327 (permitting incorporation by reference, in a later proceeding, of evidence presented at an earlier waiver hearing); *Smith v. State,* 713 N.E.2d 338 (Ind.Ct.App.1999) (allowing incorporation by reference, at a bench trial, statements made at an earlier suppression hearing), *trans. denied; Miller v. State,* 702 N.E.2d 1053 (Ind.1998), *cert. denied,* 528 U.S. 1083, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000) and *Wisehart v. State,* 693 N.E.2d 23 (Ind.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1338, 143 L.Ed.2d 502 (1999) (permitting incorporation by reference, at the penalty phase, of evidence adduced at the earlier guilt phase).

A large part of Mother's argument on this issue, and indeed the basis of her objection to this evidence at the February hearing, is that the evidence in question was admitted for a different purpose at the October, November, and December hearings than at the February hearing. We cannot agree. The matters under consideration at the earlier proceedings were petitions filed by Father to find Mother in contempt or to curtail her visitation rights because of certain acts she committed or patterns of behavior she engaged in relative to E.A. Like the earlier hearings, the February hearing focused upon the subject of visitation, but unlike the three previous hearings, the latter hearing also concerned the parties' competing petitions to modify custody. Clearly, the evidence presented at the earlier hearings was relevant not only to the episodic visitation problems confronting the court in the earlier-filed petitions, but also to the question of visitation in the broader sense, including the permanent visitation arrangement between the parties. Moreover, we note that the evidence adduced at the earlier hearings was critical to the added matter under consideration at the February hearing— terminating joint legal custody.

In making the determination of whether joint custody is appropriate, courts are guided by the principle that parents should not be permitted to maintain joint legal custody over their children if they cannot work and communicate together to raise the children. I.C. § 31–17–2–15(2) (West 1998); *Carmichael v. Siegel,* 754 N.E.2d 619 (Ind.Ct.App.2001). Thus, in determining whether joint legal custody is appropriate, courts examine whether the parents have the ability to work together for the best interests of their children. *Carmichael v. Siegel,* 754 N.E.2d 619. All of the evidence presented at the October, November, and December hearings centered on Father's allegations that Mother was violating terms of previous court visitation and custody orders. In part, the relief he sought was a curtailment of Mother's rights of visitation with E.A. The evidence presented by the parties at the earlier hearings may fairly be divided into two general categories: (1) evidence relative to the truthfulness of Father's allegations concerning Mother's actions and behavior, and (2) expert testimony about the impact of Mother's behavior upon E.A.'s physical and emotional well-being. The very same evidence was just as relevant to the matters under consideration at the February hearing as it was the earlier hearings. Past behavior is a valid predictor for future conduct. In deciding whether the parties could work together well enough to successfully implement a joint legal custody arrangement, we cannot reasonably expect the court to "forget" all of the evidence that had been presented on precisely that subject only two, three, and four months previously. That is especially so where, as here, the parties are locked in ongoing custody and visitation battles that

are characterized by persistent patterns of behavior. We note as a final matter that the incorporation by reference of the evidence presented at the previous hearings did not prevent Mother from seeking to refute, explain, or supplement that evidence at the February hearing.

In summary, the subject of the February hearing may fairly be characterized as a continuation of and expansion upon the matters before the court in the October, November, and December hearings. The prior hearings occurred near enough in time to the February hearing so as to minimize any risk that the earlier evidence was irrelevant. Finally, considerations of judicial economy in this case counsel against compelling the parties to call the very same witnesses and present the very same evidence to the same judge on the same matters that had been broached barely two months previously in the same case. The trial court was within its discretion to consider, at the February hearing, the evidence presented at the October, November, and December hearings.

■ We turn now to Mother's claim that the trial court erred in granting sole legal custody to Father. In a joint custody arrangement, the parents share the "authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." Ind.Code Ann. § 31–1–11.5–1(f) (West 1998). Under such an arrangement, it is critically important that the parents demonstrate the ability to work together for a common purpose, i.e., the child's best interests. Father produced substantial evidence that the acrimonious relationship between him and Mother rendered it impossible for the pair to work together toward a common goal. To review some of that evidence, Mother filed several allegations of abuse against Father. Subsequent investiga-

tions by the authorities failed to substantiate the allegations, and even caused authorities to question whether Mother was exerting a positive influence in E.A.'s life. There was evidence that Mother coached E.A., against his will, to say bad things about Father and Vicki and to call them derogatory names. Father also detailed several examples of Mother's unwillingness or inability to abide by the terms of the then-existing custody and visitation orders with respect to meeting with Father or Vicki to drop off or pick up E.A. Also, we note that there was evidence that Mother instigated a physical altercation with Vicki at Father's home. We need not detail the rest of the evidence in this regard. The foregoing is sufficient to demonstrate that the Mother and Father were incapable of working together well enough to make a joint custody arrangement plausible.

■ This evidence was sufficient to support the trial court's findings that Mother and Father were unable to effectively communicate with each other, and that they are unable to jointly make decisions concerning E.A. In turn, those findings support the judgment terminating joint legal custody as untenable. *See Albright v. Bogue*, 736 N.E.2d 782. The same evidence supports a conclusion that Father, and not Mother, should be given the sole legal custody of E.A.

■■ The trial court fashioned a visitation schedule that severely restricts Mother's visitation with E.A. Mother claims such severe restrictions constitute reversible error. A court may modify an order granting or denying visitation rights whenever modification would serve the child's best interests. I.C. § 31–17–4–2 (West 1998). Courts shall not, however, restrict a parent's visitation rights unless the court finds that the visitation might endanger the child's physical health or sig-

nificantly impair the child's emotional development. *Id.; Farrell v. Littell,* 790 N.E.2d 612 (Ind.Ct.App.2003). Ind.Code Ann. § 31–14–14–1 (West 1998) requires a court to make a specific finding "of physical endangerment or emotional impairment prior to placing a restriction on the noncustodial parent's visitation." "A party who seeks to restrict a parent's visitation rights bears the burden of presenting evidence justifying such a restriction." *Farrell v. Littell,* 790 N.E.2d at 616.

In its order, the court found that the "parenting time of [Mother] with the minor child shall be limited because more extensive visitation or parenting time with [E.A.] would be emotionally and psychologically harmful to the child." *Appellant's Appendix* at 222. This finding satisfies the requirements of I.C. § 31–14–14–1 so long as it is supported by the evidence.

We have described previously the evidence Father presented on the subject of Mother's behavior in E.A.'s presence. To summarize, there was evidence that Mother encouraged, and even coached, E.A. to speak ill of Father and Vicki. Mother continued to do this in spite of repeated court orders to refrain from doing so. Mother displayed an ongoing pattern of unreliability when it came to getting E.A. to school on time, picking him up from school, and meeting Father or Vicki in order to exchange E.A. Mother was a disruptive influence at E.A.'s school. Dr. Epstein indicated that E.A. was frightened of his mother and had been "psychologically hampered" by Mother's behavior and influence. *Appellant's Appendix* at 80. E.A.'s guardian ad litem submitted a December 19, 2002 affidavit indicating that Mother continued to coach E.A. to lie to authorities about Father and Vicki in order to cast them in an unfavorable light, and was in fact "training him to lie." *Id.* at 235. E.A. told Lorch that he was scared what

he was telling Lorch would "get back to his mother" and Lorch observed that E.A. "was obviously scared for that to happen." *Id.* Lorch stated her conviction that Mother was "playing mind games" with E.A. and thereby "causing him great confusion and harm." *Id.* Lorch opined that it was in E.A.'s best interests at that time to suspend all contact with Mother. In December 2002, Dr. Epstein was of the same opinion.

We are satisfied that Father presented sufficient evidence to support the court's finding that regular visitation with Mother would endanger E.A.'s physical health or significantly impair his emotional development. That finding, in turn, supports the conclusion that the trial court did not abuse its discretion in granting sole legal custody to Father and restricting Mother's visitation.

Judgment affirmed.

SULLIVAN, J., and RILEY, J., concur.