FILED

Nov 28 2023, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Robin R. Craig
Evansville, Indiana

ATTORNEY FOR APPELLEE
NIKOLAS A. MCELROY

Jonathan M. Young
Law Office of
  Jonathan M. Young P.C.
Newburgh, Indiana

ATTORNEY FOR APPELLEES
DAVID AND ANGELA JACKSON

Jeff Shoulders
Bob Zoss Law Office, LLC
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Paternity of L.J. and
L.M. (Minor Children)

Erin Jackson (Mother),

*Appellant-Respondent,*

v.

Nikolas A. McElroy (Father),

*Appellee-Petitioner,*

and

David and Angela Jackson,

*Appellees-Intervenors*

November 28, 2023

Court of Appeals Case No.
23A-JP-776

Appeal from the
Vanderburgh Superior Court

The Honorable
Mary Margaret Lloyd, Judge

Trial Court Cause No.
82D05-1402-JP-69

**Opinion by Judge Vaidik**
Judge Brown Concurs
Judge Bradford dissents with separate opinion.

**Vaidik, Judge.**

# Case Summary

[1] Erin Jackson ("Mother") appeals the trial court's order modifying custody of her children to her parents, David and Angela Jackson ("Grandparents"). To overcome the natural-parent presumption, the evidence must show (1) present unfitness of Mother, (2) long acquiescence in Grandparents' custody, or (3) past abandonment of the children such that the affections of the children and Grandparents have become so intertwined that to sever the relationship would endanger the children's future happiness. The court found that Mother abandoned the children. While Mother abandoned the children from June 2018 to December 2019, she retrieved them and had been living with them for two-and-a-half years when Grandparents filed for custody. Because the abandonment was so far in the past, it does not rebut the parental presumption favoring Mother. The court's judgment to the contrary is clearly erroneous. We therefore reverse and remand.

# Facts and Procedural History

[2] Mother has two children, L.J. (born in January 2011) and L.M. (born in October 2012). Paternity for both children was established in Nikolas A.

McElroy ("Father"). *See* Cause Nos. 82D05-1402-JP-69, 82D05-2003-JP-382.[1] Mother and the children lived at Grandparents' home from the children's birth until June 2018, when Mother moved out to live with her boyfriend. From June 2018 to December 2019, Mother did not have consistent parenting time with the children. Around this time, she also had substance-abuse issues. The children continued living at Grandparents' home until December 2019, when Mother retrieved them and they moved into an "appropriate and safe" home. Grandparents' App. Vol. II p. 5.

[3]     In March 2020, Grandparents intervened in the paternity cases and sought custody of the children as de facto custodians.[2] In November, the parties participated in mediation and reached an agreement, which the trial court approved. Under the agreement, Mother maintained custody of the children, who were then nine and eight years old, while Grandparents were awarded "grandparent visitation" one overnight per week, one weekend per month, and one week during the summer (Father's parenting time was reserved for a later hearing). Appellant's App. Vol. II p. 117. In addition, the children were ordered to undergo an evaluation by a counselor at Southwestern Behavioral Healthcare, and the parties were ordered to follow the counselor's recommendations. Two months later, the trial court awarded Father

---

[1] The trial court later consolidated JP-382 into JP-69. *See* Appellant's App. Vol. II p. 38.

[2] "De facto custodian" means "a person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least: (1) six (6) months if the child is less than three (3) years of age; or (2) one (1) year if the child is at least three (3) years of age." Ind. Code § 31-9-2-35.5.

unsupervised parenting time with the children in accordance with the Indiana Parenting Time Guidelines (Father's parenting time had previously been supervised for six hours every other Sunday).

[4] In December 2021, Grandparents filed a motion alleging that Mother had not taken the children for an evaluation at Southwestern Behavioral Healthcare as ordered by the trial court in November 2020 and asking the court to order Mother to do so. The court appointed a guardian ad litem (GAL), who issued a report in May 2022. In the report, the GAL noted that Mother hadn't enrolled the children in therapy and didn't ensure that the children went to parenting time with Father. The GAL recommended that Grandparents have primary physical custody of the children. Grandparents' App. Vol. II p. 7.

[5] A few days after the GAL's report, Grandparents petitioned to modify custody of the children. At that point, the children had been living with Mother for two-and-a-half years. In the petition to modify, Grandparents alleged that there had been a substantial change in circumstances since the November 2020 custody order and that it was in the children's best interests for Grandparents to have legal and primary physical custody of the children. Father consented to Grandparents having custody. A hearing was held over three days in September 2022, December 2022, and January 2023. The children were eleven (almost twelve) and ten years old at the time.

[6] The GAL testified that she met with the children four times. She explained that the first time she met with the children, in January 2022, they were "happy,"

"talkative," "forthcoming," and "open." Tr. Vol. II p. 240. But the next three times the GAL met with the children (April, August, and November), they were "very quiet," "very short," and "almost teetering on rude." *Id.* The GAL testified that she had encouraged Mother to ensure the children went to parenting time with Father, but Mother said she "wasn't going to make them do something they didn't want to do." *Id.* at 242.

[7] The GAL also testified that at the time of her first visit with the children, Mother hadn't taken them to Southwestern, although the children were working with a school therapist. The GAL said the children's first counseling appointment was in July 2022. When asked if Mother had been "dragging her feet" about getting the children into counseling, the GAL said she "couldn't say." *Id.* at 246. The GAL repeated her recommendation that Grandparents have primary physical custody of the children, citing three reasons: (1) the children had lived at Grandparents' house for a significant portion of their lives, (2) Grandparents would ensure that the children went to parenting time with Father, and (3) Grandparents would take the children to counseling. *Id.* at 246-47. The GAL acknowledged, however, that Mother had since "remedied" the counseling issue and was meeting the children's mental-health and medical needs. Tr. Vol. III p. 2.

[8] In March 2023, the trial court entered findings of fact and conclusions of law. Specifically, the court found that Grandparents were de facto custodians of the children, Mother had abandoned the children (thereby rebutting the presumption that she should have custody), and it was in the children's best

interests for Grandparents to have custody. Accordingly, the court awarded custody of the children to Grandparents, with Mother and Father receiving parenting time.

[9] Mother now appeals.[3]

# Discussion and Decision

[10] Mother argues the trial court erred in modifying custody of the children to Grandparents. Child-custody determinations fall squarely within the discretion of the trial court, and we reverse only for an abuse of that discretion. *Hurst v. Smith*, 192 N.E.3d 233, 243 (Ind. Ct. App. 2022). When, as here, a trial court enters findings and conclusions pursuant to Indiana Trial Rule 52, we determine (1) whether the evidence supports the findings and (2) whether the findings support the judgment. *Id.* at 242. We do not set aside the findings or judgment unless clearly erroneous. *Id.* "We neither reweigh the evidence nor assess the credibility of the witnesses but consider only the evidence most favorable to the judgment." *Id.*

[11] In a custody dispute between a natural parent and a third party (including a de facto custodian), there is a presumption that the natural parent should have custody of her child. *Id.*; *In re L.L.*, 745 N.E.2d 222, 230 (Ind. Ct. App. 2001)

---

[3] Father has filed an appellee's brief in which he joins in Grandparents' argument that the trial court properly awarded custody of the children to Grandparents.

(holding de facto custodian status does not remove the presumption in favor of natural parents obtaining or retaining custody of their children), *trans. denied.* This presumption, which is "rooted in the United States Constitution," provides a measure of protection for the rights of the natural parent but, more importantly, "embodies innumerable social, psychological, cultural, and biological considerations that significantly benefit the child and serve the child's best interests." *L.L.*, 745 N.E.2d at 229; *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002), *reh'g denied.* The third party bears the burden of overcoming this presumption by clear and convincing evidence. *L.L.*, 745 N.E.2d at 230; *see also B.H.*, 770 N.E.2d at 287.

[12] Evidence sufficient to overcome the natural-parent presumption includes a parent's (1) present unfitness, (2) long acquiescence in the third party's custody, and (3) past abandonment of the child "such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child." *L.L.*, 745 N.E.2d at 230-31; *see also B.H.*, 770 N.E.2d at 287 (stating trial courts are not limited to these three factors). If the presumption is rebutted, then the trial court engages in a best-interests analysis using the factors in Indiana Code sections 31-14-13-2 and 31-14-13-2.5. *L.L.*, 745 N.E.2d at 231.

[13] Here, the trial court found that Mother "abandoned" the children, thereby rebutting the presumption that she should have custody. Appellant's App. Vol. II pp. 39, 47. Mother first denies that she abandoned the children. In the alternative, Mother argues that if she abandoned the children, it was from June

2018 to December 2019, which was before the November 2020 custody proceedings in which Grandparents agreed that Mother would continue to have custody of the children. As such, Mother claims the abandonment cannot "serve as a basis for modifying after" November 2020 and therefore "the trial court's [c]onclusion that [Grandparents] rebutted the presumption is clearly erroneous." Appellant's Br. pp. 44, 46. We must agree.

[14] It is undisputed that the children lived with Mother at Grandparents' house from their birth in 2011 and 2012 until June 2018 and then with Mother at her house from December 2019 until the trial court's order in March 2023. Accepting as true the court's finding that Mother left the children with Grandparents from June 2018 to December 2019, which we must under our standard of review, Mother retrieved the children in December 2019 and moved them into her "appropriate and safe" home. The children lived with Mother until November 2020 when Grandparents agreed—and the trial court ordered— that Mother would continue to have custody of the children and Grandparents would have visitation. By the time Grandparents sought to modify custody of the children in May 2022, the children had lived with Mother for two-and-a-half years. Although Mother abandoned the children from June 2018 to December 2019, it was so far in the past that it can't be relied on to rebut the parental presumption favoring Mother. *See In re Adoption of W.K.*, 163 N.E.3d 370, 374 (Ind. Ct. App. 2021) (in an adoption case without parental consent based on failure to communicate, holding it would "defy logic to allow a long-past, one-year period of poor communication to overcome a lengthy period of

significant communication that immediately precedes the adoption petition"), *trans. denied*; *id.* at 375 (in an adoption case without parental consent based on failure to support, holding it would "defy logic to allow Father's alleged one-year period of not supporting the children in 2013 and 2014 to overcome his more recent support of the children, including from 2014 to 2019"). In short, third parties should not be allowed to "bank" long-past periods of poor parenting to be wielded against parents after circumstances have improved significantly. Because Grandparents did not rebut the natural-parent presumption by clear and convincing evidence, the trial court's judgment is clearly erroneous.

[15] The dissent concludes that Mother is unfit, thereby rebutting the parental presumption favoring her. But in its order, the trial court did not find that Mother is unfit. And neither Grandparents nor Father claim that Mother is unfit. In any event, other than facts showing that Grandparents are fit (such as that Grandparents' home was the children's home base and Grandparents enrolled the children in extracurricular activities), the dissent cites Mother's tardiness in seeking counseling for the children, which she has since remedied, and thwarting Father's parenting time. Both of these noncompliance issues should be dealt with through the trial court's contempt powers. *See Montgomery*

*v. Montgomery*, 59 N.E.3d 343, 350 (Ind. Ct. App. 2016), *trans. denied*. In fact, in this proceeding, the trial court denied Father's petition for contempt.[4]

[16] Because the trial court erroneously concluded that the natural-parent presumption was rebutted, we reverse the trial court and remand this case with instructions to award Mother custody of the children and reinstate the prior orders giving Grandparents visitation and Father parenting time.[5]

[17] Reversed and remanded.

Brown, J., concurs.

Bradford, J., dissents with opinion.

---

[4] The dissent also notes that the trial court found that Mother "facilitated L.M.'s relationship with a sex offender." Slip op. ¶27. Some context is in order. Mother testified that L.M.'s biological father is Jonathon Johnson, who has a conviction for sexual misconduct with a minor, and that L.M. has seen Johnson through the years believing him to be his real father. There is no evidence of any impropriety between L.M. and Johnson.

[5] Mother also argues the trial court erred in modifying custody to Grandparents because it did not "designate any substantial change in any of the statutory factors since the last custody order" in November 2020. Appellant's Br. p. 25. Given our holding above, we need not address this issue.

**Bradford, J., dissents with opinion.**

Because I disagree with the majority's conclusion that the trial court abused its discretion in awarding custody of the Children to Grandparents, I respectfully dissent. Even if one disregards Mother's abandonment of the Children entirely, there is more than enough left to rebut the presumption of parental custody and support findings of a substantial change in at least one of the relevant statutory factors and that a change of custody is in the Children's best interests. In order to adequately explain my position, I feel it necessary to relate some additional facts.

Guardian *ad litem* Kelly Ferguson ("GAL Ferguson") was appointed on January 5, 2022, and issued a report on May 5, 2022, after meeting with Grandparents, L.J. and L.M. (collectively, "the Children"), Mother, Father, and Hannah Langford of the Department of Child Services. Mother told GAL Ferguson on February 13, 2022, that "she was not going to make the boys go over [to Father's] if they did not want to" and that her attorney advised her that "she has to take them to the meeting place, and make the boys go to [Father's] car and tell them they don't want to come, and then she can't be the one that leaves first, and it won't come back on her." Grandparents' App. Vol. II p. 4. GAL Ferguson reported that she had emailed Mother several times regarding visitation but that Mother "continues to say 'I encourage them to go, but I'm not going to let them not get back in my car'." Grandparents' App. Vol. II p. 5.

GAL Ferguson met with L.J. on January 25 and April 1, 2022, and reported after the second meeting that his "demeanor was VERY different from the first

school visit" and that "[h]e appeared angry and shut down." Grandparents' App. Vol. II p. 6. L.J. indicated that he was not going to Father's anymore "because [Father's wife had] put her hands on him and [thrown] him on the couch" and that this had "happened maybe 4-5 times total." Grandparents' App. Vol. II p. 6. Later that day, however, Langford told GAL Ferguson that she "would be unsubstantiating the physical abuse allegations regarding [L.J.]." Grandparents' App. Vol. II p. 7. L.J. told GAL Ferguson that "he [would] not follow any court order that [was] made, and neither [would Mother]." Grandparents' App. Vol. II p. 6.

[21] GAL Ferguson also met with L.M. on January 25 and April 1, 2022. GAL Ferguson's May 5, 2022, report related the following regarding the first of those meetings:

> [L.M.] stated he was given the choice to go to [Father's] and chose not to go. He kept repeating the same thing, despite it being non-responsive to any question asked. He kept stating "they don't really care about me over there. They don't treat me the same. They don't love me anymore". This line of responses led to concern that these answers appeared to be coached and/or influenced in some way for some reason. [L.M.] stated that he used to go over there and liked it, but now they don't care about him.

Grandparents' App. Vol. II pp. 6–7. On April 1, 2022, L.M. told GAL Ferguson that he had not been to Father's house since his January meeting with her.

[22] The summary to GAL Ferguson's May 5, 2022, report read as follows:

Parties have been unable to co-parent effectively, and this GAL believes changes need to be made to ensure everyone has a positive, healthy relationship with the children. Mother has shown that she has not, will not, and has no plans to enforce the court order for parenting time for [Father]. She told this GAL, on numerous occasions, that she does not care what the order says, she will not force her boys to go somewhere they do not want to go. This GAL has implored her [to] comply, and she has continued to refuse. She has also failed to get them enrolled in therapy, per the order. It has been over 4 months, and she has not had an appointment set up for them, despite allegedly "trying". She has shown a blatant disrespect for this Court and Your Honor's rulings. She has also coached the children, or inadvertently steered the children towards their "feelings" towards [Father].

Grandparents' App. Vol. II p. 7. GAL Ferguson recommended, *inter alia*, that custody of the Children be granted to Grandparents.

[23] GAL Ferguson later met separately with L.J. and L.M. on August 26 and November 17, 2022, and reported on November 18, 2022, that not much had changed in the previous six months. L.J. stated that he had visited Father only once between April and August of 2022 and that he had not liked it and did not want to return. L.J. told GAL Ferguson that he would go to Father's house if the trial court "'made'" him. Grandparents' App. Vol. II p. 10. In November of 2022, L.J. told GAL Ferguson that he had not visited with Father since August.

[24] In his August 26, 2022, meeting with GAL Ferguson, L.M. indicated that he had visited with Father once between April and August of 2022 and that it "was really good." Grandparents' App. Vol. II p. 10. At the second meeting in November, L.M. told GAL Ferguson that he had not visited with Father since

August and that Mother was still telling him "'I'm not making you go, but you can' in regards to visits with [Father]." Grandparents' App. Vol. II p. 10. L.M. told GAL Ferguson that he "would go if [Mother] made him go." Grandparents' App. Vol. II p. 10. GAL Ferguson's recommendations, including that Grandparents be given custody of the Children, remained as they had been in her first report.

## I. Rebuttal of the Parental-Custody Presumption

[25] Evidence sufficient to overcome the parental-custody presumption can include a parent's (1) present unfitness, (2) long acquiescence in the third party's custody, and (3) past abandonment of the child "such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child." *In re Guardianship of L.L.*, 745 N.E.2d 222, 230–31 (Ind. Ct. App. 2001), *trans. denied*. That said, the list in *L.L.* is non-exclusive. *See In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002) (noting that trial courts are not limited to the three factors mentioned in *L.L.*). If the presumption is rebutted (and the trial court finds that a de facto guardian exists), then the trial court engages in a best-interests analysis using the factors in Indiana Code sections 31-14-13-2 and 31-14-13-2.5. *L.L.*, 745 N.E.2d at 231. I conclude that the record contains more than enough evidence to sustain the trial court's finding that the parental-custody presumption was rebutted.

[26] As an initial matter, it seems to me that the trial court was far less concerned by Mother's abandonment than it was by her failure to obtain mental-health care

for the Children, her refusal to abide by court orders regarding visitation, and her other alienating behavior. This is reflected in the trial court's order, in which it identified the following evidence as rebutting the parental-custody presumption:

- Since birth, the [Grandparents'] residence was considered the minor children's "home base."

- In June of 2018, [Mother] abandoned the children when she moved out of her parents' home to move in with her boyfriend[.] She left both the minor children in [Grandparents'] care for more one (1) year and did not consistently have any parenting time with the children or offer any real justification for abandoning the children.

- More than one (1) year passed before [Mother] retrieved the children from their school and regained custody in December of 2019 without discussing the change of residence with [Grandparents]. [Mother] sent the Maternal Grandmother an email advising her that the boys would now be living with [Mother].

- When residing with [Grandparents], the boys were provided a stable home. [Grandparents] were involved for the whole of the minor children's lives, and enrolled them into Vogel Elementary School. The Maternal Grandfather got [L.J.] set up on 504 plan and an IEP with the school.

- The Maternal Grandfather further got [L.J.] into therapy with Southwestern Behavioral Healthcare. [Grandparents] got the children involved in basketball, baseball, fishing, Cub Scouts, and hiking. The first Guardian Ad Litem report by Amy Brandsasse on November 2, 2020 reported that [Grandparents provided] a "stable home" for the children. The Maternal Grandmother reported that []they taught the boys the value of money by giving them the chance to earn money by doing chores.

- Respondent/Mother failed to obtain therapy for the children for approximately nineteen (19) months despite adding to the children's issues by informing each child that he had multiple fathers and evidence of continuing problems at the children's schools.

- [Mother] thwarted [Father's] parenting time, and advised the children that they could choose whether to attend parenting time with [Father]. At the same time, she facilitated [L.M.]'s relationship with a registered sex offender at every turn.

Order p. 12.

[27] Even if the abandonment is taken off of the table, we are left with findings, supported by evidence, that Grandparents' residence is considered the Children's "home base"; Maternal Grandfather saw to it that L.J. received the therapy he requires; Grandparents enrolled the Children in school and got them involved in basketball, baseball, fishing, Cub Scouts, and hiking; and Grandparents provided Children with a stable home. In contrast, when the Children resided with Mother, she failed to obtain therapy for them for approximately nineteen months, told both of them that Father was not their "real" father, thwarted Father's visitation with them, and facilitated L.M.'s relationship with a registered sex offender.

[28] Almost all of the above is plainly relevant to the question of Mother's present fitness as a parent. *See L.L.*, 745 N.E.2d at 230–31 (courts may consider parental fitness in determining whether the parental-custody presumption has been rebutted). At the very least, after many months of prodding and reminders that she was subject to a court order regarding visitation (the continuing violation of

which could have resulted in a contempt citation and incarceration), Mother was *still* telling the Children that they did not have to visit Father if they did not want to.

[29] To the extent that any of the circumstances identified by the trial court do not directly relate to Mother's current fitness, they are nonetheless relevant because they establish Mother's history of failing to provide mental-health care to the Children and thwarting Father's visitation, among other alienating behaviors. Because "[p]ast behavior is a valid predictor for future conduct[,]" *Arms v. Arms*, 803 N.E.2d 1201, 1210 (Ind. Ct. App. 2004), the trial court was fully entitled to take Mother's history into account. The record contains more than enough evidence to rebut the presumption that Mother should have custody of the Children.

## II.  Grandparents' Custody of the Children

[30] Because I have concluded that the parental-custody presumption has been rebutted in this case, I would reach the question of the trial court's determination that Grandparents should have custody of the Children. I conclude that the record also supports the trial court's grant of custody to Grandparents.  Pursuant to Indiana Code section 31-14-13-6, a court may only modify a child custody order if it finds that:

> (1) modification is in the best interests of the minor child; and

> (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 2 and, if applicable, section 2.5 of this chapter.

The factors listed in Indiana Code section 31-14-13-2 include:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (a) The child's parents
>>
>> (b) The child's siblings; and
>>
>> (c) Any other person who may significantly affect the child's best interest.
>
> (5) The child's adjustment to home, school, and community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.
>
> (8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

Ind. Code § 31-14-13-2.

[32] As the majority agrees, the trial court found that Grandparents were de facto custodians of the Children. Should a child or children be found to have de facto custodians, the following also applies in a custody proceeding:

> (b) In addition to the factors listed in section 2 of this chapter, the court shall consider the following factors in determining custody:
>
> (1) The wishes of the child's de facto custodian.
>
> (2) The extent to which the child has been cared for, nurtured, and supported by the de facto custodian.
>
> (3) The intent of the child's parent in placing the child with the de facto custodian.
>
> (4) The circumstances under which the child was allowed to remain in the custody of the de facto custodian, including whether the child was placed with the de facto custodian to allow the parent seeking custody to:
>
> (A) seek employment;
>
> (B) work; or
>
> (C) attend school.
>
> (c) If a court determines that a child is in the custody of a de facto custodian, the court shall make the de facto custodian a party to the proceeding.

(d) The court shall award custody of the child to the child's de facto custodian if the court determines that it is in the best interests of the child.

(e) If the court awards custody of the child to the child's de facto custodian, the de facto custodian is considered to have legal custody of the child under Indiana law.

Ind. Code § 31-14-13-2.5.

## A. Substantial Change

[33] Since the agreed order of November 12, 2020, in which all agreed that the Children would be evaluated by L.J.'s counselor at Southwestern Behavioral Healthcare and would follow any treatment recommendations, Mother has failed to pursue the specified mental-health treatment for the Children. Given that all agreed that the Children were in need of therapy that Mother has not provided, this is sufficient evidence to sustain a finding of a substantial change relating to the mental health of the children pursuant to Indiana Code section 31-14-13-2(6), which relates to "[t]he mental and physical health of all individuals involved." Moreover, there is ample evidence that, due to Mother's interference with Father's parenting time and other alienating behavior, the Children's relationship with Father has significantly deteriorated. *See* Ind. Code § 31-14-13-2(4)(a) (providing that one of the statutory factors is "[t]he interaction and interrelationship of the child with [] the child's parents"). Mother has told both Children that Father is not their "real" father and allowed them to decide whether they will have visitation with him, all while apparently

mounting a campaign to malign him and turn the Children against him. According to Father, he has "lost a huge relationship with the kids [who] hardly even acknowledge me as a Dad." Tr. Vol. II pp. 11–12. In short, the record indicates that Mother has gone to great lengths to destroy whatever relationship Father had with the Children and, unfortunately, appears to be succeeding. There is sufficient evidence to sustain the trial court's finding that there has been a significant change in one or more of the statutory factors.

## B.    Best Interests of the Children

[34]    It is well-settled that

> [a] child custody determination falls within the sound discretion of the trial court, and its determination will not be disturbed on appeal absent a showing of abuse of discretion. *In Re Guardianship of R.B.*, 619 N.E.2d 952, 955 (Ind. Ct. App. 1993). We are reluctant to reverse a trial court's determination concerning child custody unless the determination is clearly erroneous and contrary to the logic and effect of the evidence. *Id*. We do not reweigh evidence nor reassess witness credibility, and we consider only the evidence which supports the trial court's decision. *Wallin v. Wallin*, 668 N.E.2d 259, 261 (Ind. Ct. App. 1996).

*Spencer v. Spencer*, 684 N.E.2d 500, 501 (Ind. Ct. App. 1997). "[A]ppellate courts are in a poor position to look at a cold transcript of the record and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." *B.L. v. J.S.*, 59 N.E.3d 253, 259 (Ind. App. 2016) (citations and internal quotations omitted), *trans. denied*.

[35] The trial court, unlike this court, evaluated the evidence and observed the witnesses first-hand before concluding that it was in the Children's best interests to award custody of them to Grandparents. As mentioned, among the evidence heard by the trial court was evidence of Mother's reluctance to see to it that the Children received the mental-health treatment they required, her thwarting of Father's visitation, and her other alienating behaviors.

[36] Moreover, the trial court read the reports and heard the testimony of GAL Ferguson, who first recommended granting custody to Grandparents on May 5, 2022, and reiterated that recommendation on November 18, 2022. Moreover, GAL Ferguson testified that she had first met with the Children in January of 2022 and that they had been "very [] happy and talkative and forthcoming and open" during that first meeting but had been "very quiet, very short, almost teetering on rude" and "just very shut off [and] angry" during subsequent visits. Tr. Vol. II pp. 240, 241. GAL Ferguson indicated that the Children had been visiting regularly with Father prior to January of 2022; visitation had essentially ceased after that; and, when confronted, Mother had repeatedly replied "that she [had] encourage[d] the kids to go but she wasn't going to make them do something they didn't want to do." Tr. Vol. II p. 242. When GAL Ferguson was appointed, the Children were not in therapy, despite the agreed order of November 12, 2020, providing that they be evaluated and follow all recommendations. GAL Ferguson had pressed Mother repeatedly about therapy, but therapy did not actually start until July of 2022, nineteen months after the agreed order.

[37] When asked why she believed that granting custody of the Children to Grandparents was in the Children's best interests, GAL Ferguson replied,

> I believe that number one, they're safe there and comfortable there. They've been there a significant period of their life. That is the home that used Vogel as the home school. Vogel's right across from where they live. They visit with them frequently. And I believe that [Grandparents] would make sure that the Court orders are followed. [….] I believe that they would ensure that the kids go to [Father and his wife] for their visits. I believe that they would ensure that the kids go to therapy when they're supposed to. They would meet all of their needs.

Tr. Vol. II pp. 246–47. When asked in what way Mother had failed to meet the Children's needs, GAL Ferguson replied, "In a way that Mother has blatantly disregarded the Court order for the last year and a half." Tr. Vol. II p. 247. After hearing this evidence, the trial court was justified in concluding that the best way to ensure that the Children receive the mental-health care they need and reestablish a relationship with Father is to award custody to Grandparents. Because I would vote to affirm the judgment of the trial court, I respectfully dissent.